**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PRECISION METALS CORP., ANTHONY C. FIGLOZZI, and THOMAS J. FIGLOZZI,

Plaintiffs,

v.

U.S. DEPARTMENT OF DEFENSE, LLOYD J. AUSTIN III, in his official capacity as the Secretary of Defense, U.S. DEPARTMENT OF THE AIR FORCE, FRANK KENDALL, in his official capacity as the Secretary of the Air Force, DEFENSE LOGISTICS AGENCY, MICHELLE C. SKUBIC, in her official capacity as the Director of the Defense Logistics Agency, JON L. LIGHTNER, in his official capacity as the Special Assistant for Contracting Integrity of the Defense Logistics Agency, and THE UNITED STATES OF AMERICA,

Defendants.

Civ. No. ________

Oral Argument Requested

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Richard P. Donoghue
Scott D. Greenspan
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 858-1000
Fax: (212) 858-1500
richard.donoghue@pillsburylaw.com
scott.greenspan@pillsburylaw.com

Todd J. Canni (*pro hac vice forthcoming*)
J. Matthew Carter (*pro hac vice forthcoming*)
Kevin R, Massoudi (*pro hac vice forthcoming*)
PILLSBURY WINTHROP
SHAW PITTMAN LLP
725 South Figueroa Street, 36th Floor

Los Angeles, CA 90017-5524
Tel: (213) 488-7100
Fax: (213) 629-1033
todd.canni@pillsburylaw.com
matt.carter@pillsburylaw.com
kevin.massoudi@pillsburylaw.com

*Counsel for Plaintiffs Precision Metals Corp., Anthony C. Figlozzi, and Thomas J. Figlozzi*

# TABLE OF CONTENTS

**Page**


INTRODUCTION .................................................................................................... 2

STATEMENT OF RELEVANT FACTS .................................................................... 18

I. The Notice of Proposed Debarment ..................................................................... 18

II. Plaintiffs' Presentation of Matters In Opposition to the NPD .............................. 20

III. The Debarment Decisions .................................................................................. 21

ARGUMENT ......................................................................................................... 21

I. Standard of Review .............................................................................................. 21

A. Temporary Restraining Order/Preliminary Injunction ........................................ 21

B. Administrative Procedure Act ............................................................................ 22

II. Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits ................. 24

A. The Debarment Decisions Violate the Administrative Procedure Act and Plaintiffs' Due Process Rights ............................................................................ 25

1. DoD Violated Its Own Procedures Set Forth In the NPD and the FAR, DFARS, and Precision's Due Process Rights When It Denied Plaintiffs a FAR 9.406-3(c) In-Person Meeting ..........................................................................25

2. DoD Violated the NPD, FAR, DFARS, and Precision's Due Process Rights When It Denied Precision a FAR 9.406-3(d) Fact-Finding Hearing ...........................30

3. DoD Improperly Ignored the Information and Argument that Plaintiffs Submitted Concerning the Five Orders Underlying the Proposed Debarment............35

4. DLA Did Not Give Meaningful Consideration to the Mitigating Factors & Remedial Measures ..........................................................................39

A) DLA's Substantial Role In the Delays Associated with 5 Orders & Overall Backlog ........................................................................................ 39

B) The Impact of the COVID-19 Pandemic on Precision, Including Reduction in Staffing, Supply Chain Issues, and Impact on Suppliers ................................. 42

C) Thomas' Serious Health Ailments & Impact on Precision ................................. 43

D) Precision's Enhanced Quality Management System Procedures......................... 43

E) Precision's Robust Values-Based E&C Program .............................................. 46

F) Precision's Retention of Monitors to Conduct an Evaluation of Precision's QMS & E&C Programs and to Report to DoD................................................... 47

G) FAR 9.406-1 Mitigating Factors and Remedial Measures .................................. 48

5. DoD Failed to Meaningfully Consider the Proposed Administrative Agreement, Including Monitoring, and How Such Could Have Been Used to Address Any Remaining Concerns ....49

6. DoD Did Not Establish a Cause for Debarment By a Preponderance of the Evidence ....51

7. DoD Appears to Have Used Debarment to Punish Plaintiffs Rather than Protect the Government ....53

8. Debarment of Thomas and Tony Based on Imputation and Affiliation Was Improper ....55

B. This Court's Due Process Analysis Shows that the Debarment Decisions Violated Plaintiffs' Due Process Rights .... 57

III. Plaintiffs Will Suffer Irreparable Harm If an Injunction Is Not Issued .... 60

A. Plaintiffs Will Suffer Certain, Great, Actual, and Imminent Irreparable Harm Because Their Business Will Not Survive If the Debarment Decisions Stand and They Are Deprived of the Ability to Compete for DoD Contracts and Subcontracts .... 60

IV. The Balance of Harms and Equities Weighs Heavily in Plaintiffs' Favor .... 63

V. The Public Interest Favors the Issuance of an Injunction .... 65

CONCLUSION .... 65

# TABLE OF AUTHORITIES

Page(s)

Cases

A.H. by & through Hester v. French,
985 F.3d 165 (2d Cir. 2021)....................24

Albert Gonzales v. United States Department of Housing and Urban Development,
Civ. Act. 00-WM-495, 2000 U.S. Dist. LEXIS 18935 (December 1, 2000)....................32

Ali v. Health and Human Services,
No. 97-15264, 152 F.3d 923, 1998 WL 416473 (9th Cir. July 6, 1998) ....................13, 33, 34

Asbestec Const. Servs., Inc. v. U.S. E.P.A.,
849 F.2d 765 (2d Cir. 1988)....................57

Atterbury v. U.S. Marshals Serv.,
805 F.3d 398 (2d Cir. 2015)....................22

Beacon Assocs., Inc. v. Apprio, Inc.,
308 F. Supp. 3d 277 (D.D.C. 2018)....................63

Campbell v. Schmidt,
No. 1:20-CV-1785 (CRC), 2020 WL 6445874, at *5 (D.D.C. Nov. 3, 2020)....................22

Dexter 345 Inc. v. Cuomo,
663 F.3d 59 (2d Cir. 2011)....................60

Doe v. United States Dept. of Justice,
753 F.2d 1092 (D.C. Cir. 1985)....................57

Doyle v. United States Dep't of Homeland Security,
959 F. 3d 72 (2nd Cir. 2020)....................23

Ecolab Inc. v. Paolo,
753 F. Supp. 1100 (E.D.N.Y. 1991) ....................62

Fayer v. Romney,
365 F. Supp. 317 (S.D.N.Y. 1973) ....................23

Friedler v. General Services Administration,
271 F. Supp. 3d 40 (D.D.C. 2017).................... *passim*

General Elec. Co. v. Jackson,
610 F.3d 110 (D.C. Cir. 2010)....................58

Int'l Exports, Inc. v. Mattis,
No. 14-2064, 265 F.Supp.3d 35 (D.D.C. 2017)....23

Janik Paving & Const., Inc. v. Brock,
828 F.2d 84 (2d Cir. 1987)....22

Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.,
475 F. Supp. 1282 (E.D.N.Y. 1979)....60

John E. Hull Inc. v. Waterbury Petroleum Products Inc.,
588 F.2d 24 (2d Cir. 1978), cert. denied, 440 U.S. 960 (1979)....60

John Gil Const., Inc. v. Riverso,
72 F. Supp. 2d 242 (S.D.N.Y. 1999)....57

Just. v. Kuhnapfel,
985 F. Supp. 2d 334 (E.D.N.Y. 2013)....21

Karawia v. U.S. Dept. of Labor,
627 F. Supp. 2d 137 (S.D.N.Y. 2009)....22

League of Women Voters of the United States v. Newby.,
838 F.3d 1 (D.C. Cir. 2016)....65

N. Mariana Islands v. United States,
686 F. Supp. 2d 7 (D.D.C. 2009)....65

United States v. Northern Adult Daily Health Care Center,
205 F. Supp. 3d 276 (E.D.N.Y., 2016)....22

Perry St. Software, Inc. v. Jedi Techs., Inc.,
No. 20-CV-04539, 2020 WL 6064158 (S.D.N.Y. Oct. 14, 2020)....63

Pharaohs GC, Inc. v. United States Small Bus. Admin.,
990 F.3d 217 (2d Cir. 2021)....21

Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.,
337 F. Supp. 3d 308 (S.D.N.Y. 2018)....64

Reeve Aleutian Airways, Inc. v. United States,
982 F.2d 594 (D.C. Cir. 1993)....58

Resource Applications, Inc. v. Environmental Protection Agency,
No. 93-2525 (D.D.C. Jan. 11, 1994)....14, 26, 35, 38

Reuters Ltd. v. F.C.C.,
781 F.2d 946 (D.C. Cir. 1986)....2

Rutigliano Paper Stock, Inc. v. U.S. Gen. Services Admin.,
967 F. Supp. 757 (E.D.N.Y. 1997) ........................................ *passim*

Sameena Inc. v. US Air Force,
147 F.3d 1148 (9th Cir. 1998) ........................................13, 32, 33, 58

SecurityPoint Holdings, Inc. v. Transportation Sec. Admin.,
769 F.3d 1184 (D.C. Cir. 2014) ........................................15

Silverman v. United States Department of Defense,
817 F. Supp. 846 (S.D. Ca. 1993) ........................................15, 54

Sterlingwear of Boston, Inc. v. United States,
11 Cl. Ct. 879 (1987) ........................................ *passim*

Trump v. International Refugee Assistance Project,
137 S. Ct. 2080 (2017) ........................................64

TVC Albany, Inc. v. Am. Energy Care, Inc.,
No. 1:12-CV-1471, 2012 WL 5830705 (N.D.N.Y. Nov. 16, 2012) ........................................63

New York v. United States Dep't of Homeland Sec.,
969 F.3d 42 (2d Cir. 2020) ........................................63

Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,
559 F.2d 841 (D.C. Cir. 1977) ........................................24

Constitutions

United States Constitution
Fifth Amendment ........................................1, 57, 59

Statutes and Codes

United States Code
Title 5, Section 701 et seq. ........................................24
Title 28, Section 2412 ........................................18

Rules and Regulations

Defense Federal Acquisition Regulation Supplement
Subpart 209.4 ........................................19, 37
Subpart 209.406-1 ........................................48

Federal Acquisition Regulation
Subpart 3.10 ........................................49
Subpart 9.4 ........................................2, 6, 37

Subpart 9.402(b) ....................................................................................................53
Subpart 9.403 ....................................................................................................56
Subpart 9.406 ....................................................................................................37
Subpart 9.406–3 ....................................................................................................9, 23, 26
Subpart 9.406-1 .................................................................................................... *passim*
Subpart 9.406-2(b) ....................................................................................................19, 51
Subpart 9.406-2(c) ....................................................................................................19
Subpart 9.406-3(b) ....................................................................................................31, 36, 37
Subpart 9.406-3(c) .................................................................................................... *passim*
Subpart 9.406-3(d) .................................................................................................... *passim*
Subpart 9.406-3(f) ....................................................................................................48
Subpart 9.406-5(b) ....................................................................................................55

<u>Other Authorities</u>

Cathy Hopkins, Face-to-Face Interactions, Encourage Relationship Building, Improve Warfighter Support, Defense Logistics Agency (2017), https://www.dla.mil/AboutDLA/News/ NewsArticleView/Article/1350957/face-to-face-interactions-encourage-relationship-building-improve-warfighter-su/ (last visited May 25, 2022) ....................................................................................................29

FY2020 Section 873 Report to Congress, ISDC (Mar. 22, 2022), available at https://www.acquisition.gov/sites/default/files/page_file_uploads/ISDC_FY_2020_Section_873_Report_(use_for_web_upload).pdf ....................................................................................................8, 16, 50

Plaintiffs seek to enjoin the U.S. Department of Defense's ("DoD") improper Government-wide debarments of a Service-Disabled Veteran-Owned Small Business ("SDVOSB") – Precision Metals Corp. ("Precision" or "Company") – its Founder and service-disabled majority owner – Thomas J. Figlozzi ("Thomas") – and his son and Precision's President – Anthony C. Figlozzi ("Tony") – who epitomize the "American Dream" of New York-based Italian Americans working tirelessly day-in and day-out over more than 35-years and two generations to realize their vision of building an American success story that employs 42-hardworking Americans on Long Island's Bay Shore, New York in Suffolk County.

This legal action is necessary to save Precision from permanently closing its doors and the unfortunate layoffs of all of its employees, which will inflict irreparable harm on Plaintiffs, their employees, and their employees' families who depend on Precision to sustain their lives. Absent immediate action to enjoin these improper debarments and to reinstate our clients' eligibility to receive government contracts, our clients will lose everything they have built over their lives, and all of these hardworking employees will be left without income to support themselves and families. Indeed, just since the debarments were imposed, Precision had to turn down a more than $1,700,000 award from one of its key prime DoD contractors. The critical importance of this matter cannot be overstated. In further support of their Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, Plaintiffs provide the following[1]:

---

[1] Undersigned counsel understands that this memorandum in support of Plaintiffs' Order to Show Cause likely exceeds the page limitation of the individual Judge's Practices and Rules ultimately assigned to this case and will bring an application for leave to exceed the page limitations once a judge is assigned if requested by the court. Good cause exists for the length of this brief. Plaintiffs are in danger of imminent and irreversible harm as a result of Defendants' debarment actions taken against Plaintiffs. Under the circumstances, Plaintiffs do not believe that they can adequately address the complex and important issues implicated within the page limitations likely imposed. Due to the extensive number of legal issues and lengthy time period involved, a more extensive briefing is necessary to ensure the Court has a fulsome understanding of all of the relevant issues before making a decision. In order to sufficiently address the multitude of issues that are at the center of this issue, and in order to demonstrate to this Court that Plaintiffs will likely ultimately succeed in their cause of action, the additional pages are necessary. Moreover, no party will suffer any prejudice if the Court considers this memorandum in its current

## INTRODUCTION

DoD did not follow its own debarment rules and regulations in violation of Plaintiffs' due process rights under the Fifth Amendment to the U.S. Constitution. It is axiomatic that an agency must follow its own rules:

> [I]t is elementary that an ***agency must adhere to its own rules and regulations*** . . . . Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life.

*Reuters Ltd. v. F.C.C.*, 781 F.2d 946, 950 (D.C. Cir. 1986) (emphasis added).

Defendant DoD, acting through Defendants the Secretary of Defense, the Department of Air Force, the Secretary of the Air Force, the Defense Logistics Agency ("DLA"), DLA's Director, and DLA's Special Assistant for Contracting Integrity (*i.e.*, its Suspension and Debarment Official ("SDO")) (collectively referred to as the "DoD"), ignored the well-established debarment rules and unlawfully short-circuited the process set forth in DoD's Notice of Proposed Debarment ("NPD"), the Federal Acquisition Regulation ("FAR") and the Defense Federal Acquisition Regulation Supplement ("DFARS") and stripped Plaintiffs of their constitutionally-protected due process rights by not holding the required in-person meeting with Plaintiffs prior to making its final decision in this case and, if that in-person meeting did not bring about a resolution, by not holding the required fact-finding proceeding before making findings of fact and issuing the Debarment Decisions. In addition to these serious process violations, DoD committed ***many violations*** of governing regulations and case law as detailed in Plaintiffs' Complaint.

form. By contrast, Plaintiffs may be unable to fully brief the panoply of critical issues leaving the Court with a less complete picture and understanding, which could lead to a delayed decision and/or adverse outcome causing irreparable harm to Plaintiffs if the additional pages are not allowed.

FAR Subpart 9.4 makes pellucidly clear that debarment is not to be used for purposes of punishment and is only to be used against non-responsible contractors who present a threat to DoD – not good, ethical small-business manufacturers of high-quality parts that DoD has depended upon for decades. Nor is debarment to be used because of delays in performance particularly where the Government caused or contributed to those delays.

In many ways, Precision embodies the model small business build-to-print DoD manufacturer. DoD provides Precision with old, sometimes illegible or ambiguous blueprints for legacy parts that could be decades old. DoD then asks Precision to manufacture a first article for Government inspection and, once approved, to proceed with building production parts. In many instances, there are problems with the blueprints, issues that could take months or longer for DoD to resolve. These issues lead to delays upon delays. The earlier delays impact other orders and cause delays; the "Domino" effect of DoD delays are very real for a small business manufacturer. Precision persists through these administrative issues and works hand and glove with DoD to deliver high quality parts DoD can depend upon. Without innovative contractors like Precision who find a way to build these legacy parts using modern technology to keep DoD's aging fleet in the air and on the seas, DoD would not function as it does today.

There are no complaints at all with the high quality of Precision's manufactured parts. Nor are there any ethics or integrity concerns. Rather, this debarment case is solely about on-time delivery. Compl. Exh. 2, Precision Debarment Decision at 5-6 ("the basis of this action is the Respondents' on-time delivery rate of DLA purchase orders"). Indeed, Precision has a long 35-year successful history of supporting DoD and DoD prime contractors. Indeed, based on historical records available to Plaintiffs, Precision has successfully delivered ***over 290,000 parts*** involving ***over $87 million*** in DoD government contract and subcontract awards. Precision's

quality score on all parts delivered to DLA since January 2019 ***is over 99.99%***. Precision's hard-earned reputation for being a high-quality manufacturer of build-to-print parts has made it a trusted supplier of DoD and some of the Nation's largest and most respected DoD prime contractors.

Despite this incredible track record of success, which few contractors have, DLA's Debarment Office, which reports to DLA's Director, who reports to DoD leadership, ***picked five orders*** between DLA and Precision that were not delivered on-time and ultimately cancelled by DLA at no cost to either party. As set forth in DoD's Debarment Decisions, DLA used those five orders to "***form the basis of this action***." Compl. Exh. 2, Precision Debarment Decision at 4. The decision that could put Precision out of business and ruin the lives of its founder and his family is based on five specific orders of thousands successfully performed by Precision.

Rather than ask the logical question of whether DoD contributed to these performance delays, DoD simply assumed that Precision was at fault for each cancelled order and did not consider the role played by DLA in the outcome of those orders. That erroneous assumption led to DLA issuing each Plaintiff an NPD followed by the Debarment Decisions. DLA's actions and inactions, however, affected each of these orders and led to delays that precluded and adversely affected Precision's performance and ultimately the cancellation of those orders at no cost to either party. The complete story shows that these five orders do not give rise to a cause for debarment, and the Debarment Decisions are improper.

Plaintiffs have tried to address DoD's concerns and to resolve this matter amicably without seeking judicial relief. Plaintiffs treated DoD's concerns with the utmost seriousness and retained undersigned counsel and thereafter worked closely with legal counsel to prepare and submit an ***85-page*** Presentation of Matters in Opposition ("MIO") in response to the NPD

***denying and disputing the allegations*** regarding the five orders and providing a plethora of information and argument in opposition. In their MIO, Plaintiffs demonstrated that the Administrative Record ("AR")[2] underlying the NPD did not provide a cause for debarment and, at a minimum, that DLA's ***one-sided allegations*** were in genuine dispute giving rise to the regulatory requirement that ***a fact-finding hearing be conducted***.

Among other things, Precision demonstrated that the outcome of the orders was largely attributable to DLA furnishing incomplete, ambiguous, and/or defective technical specifications to build the parts and DLA's non-responsiveness and delay in furnishing support and contract administration to resolve those issues in a timely manner. Once DLA finally provided the requested support many months after it was requested, understandably Precision could not immediately turn to processing those orders on DLA's established timeline given it had other orders that needed to be processed to meet their own delivery schedules. DLA's actions and inactions created a "Domino" effect within Precision and DoD completely ignored such. While DoD's delays were the primary reason for the delays in performance, Precision also encountered excusable delays associated with supplier issues and supply-chain shortages, ultimately followed by the COVID-19 pandemic, which severely impacted manufacturing operations in 2020 through 2021 and forced Precision and its suppliers to rely on a drastically reduced skeleton workforce. Indeed, at times, Precision was forced to close its doors and, at other times, went from over 40-employees to a crew of 10 employees. The effects of COVID-19 were very real for this small business manufacturer.

Plaintiffs presented information showing that none of the five orders were terminated for default or cause by DLA, which is the type of action to be taken if the contractor is at fault. To

---

[2] The AR provided to Plaintiffs with the NPD is attached to the Complaint as Exhibit 19.

the contrary, DLA cancelled each order at "no cost" to either party. Plaintiffs explained that the fact DLA opted to go the "no-cost" cancellation route confirmed that Precision was not to blame for the five orders not being delivered on-time. The Debarring Decisions acknowledge this fact but do not reconcile these facts with the decision to debar.

Precision is a small business without unlimited resources and cannot work without timely support from its customer, and those were five orders of over two thousand successfully performed by Precision since 2012. To illustrate how focusing on a "cherry-picked" set of orders is misleading and did not afford DoD a true sense of how reliable, capable, and valuable Precision is as a supplier to DoD and DoD prime contractors, in its MIO, Precision identified five orders where DLA's performance led to, on average, ***delays of 780 days***. Indeed, for two orders, DLA was over ***1,000 days late***.

While Plaintiffs disputed and denied that Precision was responsible for the delays associated with the five orders, Plaintiffs also demonstrated that, notwithstanding those orders, they are "presently responsible" – the standard in debarment cases – making debarment wholly unnecessary and punitive if imposed. Indeed, aware that the debarment process is about "protection" – not punishment – and demonstrating "present responsibility" notwithstanding past events, Plaintiffs presented multiple mitigating factors and remedial measures to DoD for consideration as FAR Subpart 9.4 recognizes.

Illustrative of its commitment to excellence and continual improvement – the hallmarks of a responsible contractor – Precision studied the events behind performance delays and developed numerous enhancements to its AS9100-Rev. D Certified Quality Management System ("QMS") – taking it beyond what AS9100-Rev. D requires – to significantly mitigate the occurrence of delays. Precision already possessed ***a best practices QMS*** meeting the highest

quality management standards for the aerospace industry, but nonetheless used the historical events regarding its experience working with DLA and developed a collection of tailored enhancements to mitigate further delays from occurring. Each of these enhancements reflect thoughtful changes in how Precision can service DLA uniquely. DLA is rather unique as a customer; it is not the end user of the parts ordered, but rather is ordering these parts on behalf of DoD agencies and, in turn, DLA rarely has the full technical data package or can resolve technical engineering questions. In nearly every instance, DLA must go back to the actual end user for input and guidance. For these orders, ***the Air Force was the end user*** of at least four of five orders.

Naturally, this leads to unique challenges for a contractor attempting to support DLA. ***The MIO spent eight pages discussing these thoughtful enhancements*** in detail and presented extensive evidence and information demonstrating that the enhanced QMS procedures already had improved Precision's on-time delivery rates. Rather than credit Plaintiffs for making these thoughtful improvements that go beyond what AS9100-Rev. D requires, DoD used Precision's acknowledgment that it can improve to fault Precision. *See* Compl. Exh. 2, Precision Debarment Decision at 4.

Additionally, aware that DoD may continue to have concerns with Precision's on-time delivery notwithstanding the wealth of information presented addressing such concerns, Plaintiffs proactively retained an monitoring team comprised of the former counsel to the DLA SDO and the former counsel to the Navy SDO – ***who combined have over 50 years of experience in the suspension and debarment space*** – to visit Precision's manufacturing facility, to interview its workforce, to evaluate Precision and to prepare a report to be shared with DoD addressing the enhanced QMS measures, Precision's on-time delivery rates, and the reduction of

Precision's backlog (*i.e.*, late orders). This distinguished monitoring team has visited Precision's facility on two separate occasions and issued two comprehensive reports confirming that Precision's enhanced procedures are working as intended to mitigate delays, substantially improve its on-time delivery rates, and to reduce its backlog.

Precision even invited the SDO and his staff to visit Precision's manufacturing facility to see for themselves if they did not want to take Precision's word for it or that of the monitors. Rather than take Precision up on its offer, the SDO's staff declined stating: "Thank you for your note and offer to visit your client's facilities. ***However, I do not believe we are interested in visiting Precision Metals' facility***." *See* Compl. Exh. 17, E-Mail Correspondence Dated January 27, 2022 (emphasis added).

As a further gesture to address DoD's concerns, Plaintiffs proposed a resolution of the administrative action through entering into a three-year Administrative Agreement – containing terms acceptable to DLA – subject to monitoring to address any lingering concerns that DLA may have had. The MIO explained that not only would an Administrative Agreement afford DLA the ability to oversee and monitor Precision as it performs orders, but an Administrative Agreement would preserve a valuable supplier to DoD and DoD prime contractors. DLA is quite experienced and familiar with Administrative Agreements and entered into more than a dozen during 2019 and 2020. It remains unclear why DLA declined Plaintiffs' offer of an Administrative Agreement here, particularly where DLA has entered into at least a dozen Administrative Agreements during 2019-2020 according to publicly-available reports published by the Interagency Suspension and Debarment Committee ("ISDC"). *See FY2019 Section 873 Report to Congress, ISDC* (Jan. 15, 2021), available at https://www.acquisition.gov/sites/default/files/page_file_uploads/ISDC%20FY19%20873%20Re

port.pdf; *FY2020 Section 873 Report to Congress, ISDC (Mar. 22, 2022), available at* https://www.acquisition.gov/sites/default/files/page_file_uploads/ISDC_FY_2020_Section_873_Report_(use_for_web_upload).pdf

As set forth in Plaintiffs' comprehensive 100-plus page Complaint, the Debarment Decisions were arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation, in violation of the APA and Plaintiffs' constitutional due process rights.

First, DoD violated the procedural safeguards embedded in the governing regulatory framework by denying Plaintiffs ***the ability to meet in-person*** with the decision-maker SDO ***before a final decision was reached***. That violation, alone, requires that this Court enjoin DoD's Debarment Decisions. As reflected in Plaintiffs' MIO and e-mail correspondence between Plaintiffs' and DLA's Debarment Office, ***on multiple occasions***, Plaintiffs requested DLA to hold an in-person meeting following receipt of Plaintiffs' MIO as required by the NPD, the FAR, and the Defense Federal Acquisition Regulation Supplement ("DFARS"). The purpose of the in-person meeting is ***to afford the contractor due process*** and to allow the contractor to present additional information and argument in response to the NPD, which may address and resolve the SDO's concerns and/or further create a genuine dispute over material facts, and to enable the SDO to ask questions of the contractor and for the contractor to have an opportunity to address those questions *before* a final decision is reached. Newly appointed United States Supreme Court Justice Ketanji Brown Jackson explained in a debarment case before her prior to being appointed to the highest court that "where, as here, [an agency] ignores its own regulations and imposes a debarment that does not adhere to the procedural due process mandates of FAR 9.406–3, it has acted arbitrarily and capriciously, no matter how well-reasoned and seemingly well-

supported its ultimate conclusion might be." *Friedler v. General Services Administration*, 271 F. Supp. 3d 40, 61 (D.D.C. 2017).

DLA's decision not to provide the in-person meeting *before* reaching a final decision was highly prejudicial. Indeed, had DLA met with Plaintiffs as required by law, Plaintiffs would have been able to share, among a host of other positive information reflecting on its present responsibility, material updates since its prior submission including that the enhancements to its AS9100-Rev. D Certified QMS have led to a ***significant reduction of over 40-percent*** in Precision's backlog of open orders measured from the backlog existing in December 2021 as compared to today, and continued to improve considerably the Company's on-time delivery rate. Specifically, the enhanced QMS procedures have led to on-time delivery rates of ***83-percent for 2021 and 100-percent for 2022*** for all orders following DoD approval of the first article.

Such information would have been well-received by DLA as the Debarment Decisions questioned the effectiveness of the enhanced QMS measures and whether they were working in improving Precision's on-time delivery and backlog. Notably, these on-time delivery rates ***exceed DLA's stated goal of a 75% on-time delivery rate*** for even its very top suppliers. Compl. Exh. 1, Cathy Hopkins, Face-to-Face Interactions, Encourage Relationship Building, Improve Warfighter Support, Defense Logistics Agency (2017) (noting that "***DCMA has an internal performance requirement to try to achieve 75 percent on-time-delivery from their top DCMA 500 highest volume supplier***") (emphasis added). This data contradicts DoD's central conclusion in the Debarment Decisions that Precision's "enhanced QMS procedures are not working to increase their on-time delivery rates," and instead shows that once DoD approves and accepts Precision's presented first article and establishes a production delivery schedule, that Precision's enhanced QMS procedures are working as intended and substantially improving on-

time delivery. *See* Compl. Exh. 2, Precision Debarment Decision at 8. And, this is the appropriate time period to measure in assessing on-time delivery rates because it occurs after Precision has submitted its first article for evaluation and DLA has approved the first article – which means all of the technical data exists and a production delivery schedule has been established and ***nothing further is needed from DLA*** which could delay performance.

In short, by deviating from the required regulatory process, DLA deprived Plaintiffs of an opportunity to learn of DoD's remaining concerns and to present additional information and argument through an in-person meeting that would have demonstrated to DLA that debarment was not necessary to protect the Government's interests. Moreover, Plaintiffs would have used the meeting to ask its proposed monitors to present their observations and findings following their multiple visits to Precision's manufacturing facility. Finally, Plaintiffs and the proposed monitors would have been available to answer any questions DLA raised during the meeting.

Second, and while we believe the required in-person meeting would have brought about a resolution of the matter, DLA also glossed over the fact that Plaintiffs' MIO disputed the alleged cause for debarment and created a genuine dispute over material facts giving rise to the additional regulatory requirement that, if the in-person meeting between the contractor and SDO did not resolve the SDO's concerns, that the SDO conduct a formal fact-finding proceeding and issue formal findings of fact *before* proceeding forward with a final decision. The purpose of the fact-finding hearing – which is required where, as here, a contractor's MIO creates a genuine dispute over material facts underlying the NPD – is to afford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the Government presents *before* a final decision is reached.

DLA violated the NPD, the FAR, the DFARS, and Plaintiffs' due process rights when it resolved genuine disputes over material facts without holding the required fact-finding hearing in violation of FAR 9.406-3(d). Plaintiffs' ***85-page*** Presentation of Matters in Opposition ("MIO") addressed and disputed the specific allegations set forth in the NPD pertaining to five DLA orders – "***that form the basis of this action***" – and presented extensive information that DLA was at fault for the delays associated with these orders, which ultimately led to no cost cancellation of these five orders as opposed to terminations for default, which is the appropriate action where the delays are contractor caused.

Yet, despite acknowledging that Plaintiffs' MIO disputed the allegations underlying the NPD ("When addressing each of the contracts that form the basis of this action, the ***Respondents' MIO accepts no fault for why the orders turned out the way they did*** . . .") – which triggered the requirement for a fact-finding hearing under the FAR and DFARS – DoD improperly disregarded the information and arguments set forth in the MIO and summarily concluded that Plaintiffs had "cite[d] to no disputed material fact which would give rise to a fact finding." Compl. Exh. 2, Precision Debarment Decision at 6 (emphasis added). DoD's recognition of Plaintiffs' clear dispute of the allegations cannot be reconciled with its ultimate decision to proceed with debarment without holding the required fact-finding hearing. Rather than conduct the required fact-finding hearing under FAR 9.406-3(d) and DFARS Appendix H-104(a), DoD arbitrarily skipped that important step – which prejudiced Plaintiffs – and instead simply conducted its own assessment about the credibility of the evidence presented by Plaintiffs in their MIO and unsurprisingly decided to embrace DLA's allegations that Precision was at fault for the delays.

Understandably, courts have properly recognized that the fact-finding hearing is the appropriate forum for the SDO to weigh the evidence presented by both parties and to make credibility assessments about the information and argument presented by the parties. *See, e.g., Sterlingwear of Boston, Inc. v. United States*, 11 Cl. Ct. 879, 887 (1987) ("The debarring official, faced with this evidence, should have recognized that, while circumstantial for the most part, this evidence was nonetheless certainly sufficient to raise an issue of fact."). Indeed, it is obvious that if the decision-maker who has decided to debar may conclude that the contractor's dispute is not genuine and dismiss such on his or her own by concluding they are not credible, that there will never be found to exist a genuine dispute. Courts have further recognized that a contractor's MIO creates a genuine dispute of material fact where, as here, it addresses and disputes the allegation, and have further stated that "[t]he FAR clearly requires that [an agency] hold an evidentiary hearing under such circumstances." *Ali v. Health and Human Services*, No. 97-15264, 152 F.3d 923, 1998 WL 416473 at *2 (9th Cir. July 6, 1998). As DoD already recognized that Plaintiffs disputed the allegations in their MIO and the MIO makes clear that Plaintiffs raised a genuine dispute over the material facts, a fact-finding hearing was required.

Thus, this Court should find that, by failing to hold a fact-finding hearing, DLA once again deviated from the process prescribed by the NPD, FAR and DFARS, which is meant to afford due process, and deprived Plaintiffs of a fundamental opportunity to present additional information and argument *before* a final decision was reached. *See Sameena Inc. v. US Air Force*, 147 F.3d 1148, 1154-55 (9th Cir. 1998) (holding under virtually identical circumstances that "the Air Force violated the appellants constitutional right to due process in failing to comply with binding regulations [concerning the fact-finding hearing] and that the appellants are entitled to such a hearing . . . .").

Third, DLA arbitrarily and capriciously disregarded the substantial information and argument that Plaintiffs submitted disputing and denying the allegations regarding the five orders underlying the NPD. Indeed, when discussing Plaintiffs' MIO, DoD repeatedly claimed that Plaintiffs failed to provide *any* evidence to support their assertions that the orders did not provide a cause for debarment. But that conclusion is flawed, as case law, the FAR, and the DFARS make clear that ***Plaintiffs' 85-page MIO is evidence***.

To the extent that the SDO had questions or concerns about the evidence supporting Plaintiffs' assertions, the Plaintiffs' MIO expressly informed the SDO that if he desired additional supporting documentation, ***it would be furnished upon request***. *See* Compl. Exh. 3, MIO at 29 n.5 ("The below discussion is based on Precision's historical records. If your office would like copies of the documents underlying this discussion, we will furnish such upon request."). The SDO also could have used the FAR 9.406-3(c) in-person meeting to ask Plaintiffs about the evidence underlying their assertions; indeed, that is one of the reasons such an in-person meeting requirement exists. Indeed, when the U.S. District Court for the District of Columbia was presented with similar circumstances in another suspension and debarment case, Senior Judge Royce C. Lamberth explained that it was "arbitrary and capricious" for an SDO "to refuse to go back to the contractor when you say, 'I don't have enough information to decide it, so I'll just go ahead and suspend you anyway.'" *See* Compl. Exh. 4, Transcript of Motions Hearing Before the Honorable Royce C. Lamberth United States District Judge at 63, *Resource Applications, Inc. v. Environmental Protection Agency*, No. 93-2525 (D.D.C. Jan. 11, 1994). It was arbitrary and capricious for DoD in this case not to go back to Plaintiffs, afford them their requested in-person meeting, and either before the meeting or during the meeting, ask them to provide whatever supporting evidence the SDO believed was necessary for Plaintiffs to "prove

their assertions." But to summarily reject Plaintiffs' well-documented dispute is quintessential arbitrary and capricious decision-making.

Fourth, the record reflects that DoD did not meaningfully consider the numerous "mitigating factors" and "remedial measures" presented in Plaintiffs' MIO as is required by FAR 9.406-1. Indeed, even where a cause for debarment exists – which Plaintiffs' dispute here – the FAR is clear that debarment does not follow unless the SDO concludes that the contractor is not presently responsible and that debarment is needed to protect the Government. Among the many mitigating factors and remedial measures presented in Plaintiffs' MIO, DoD summarily rejected Plaintiffs' evidence showing that DLA-related delays delayed performance of the five orders underlying the NPD and further impacted approximately 50% of Precision's current backlog of open orders, which similarly creates a "Domino-effect" on other orders, which too was ignored by DoD. DoD also arbitrarily minimized the significant impact that Thomas' serious health ailments had on Precision, which was followed by the COVID-19 pandemic, which devastated Precision, its workforce, its suppliers, and its vendors. The supply chain impact associated with COVID-19 is well understood. Indeed, the combination of the DLA-related delays, the "Domino" effects of such, coupled with Thomas' health issues and COVID-19 cannot be overstated, and yet the record shows that DoD glossed over such in its Debarment Decisions. Plaintiffs further presented an extensive list of remedial measures, including enhanced QMS procedures to mitigate the occurrence of delays and enhancements to its overall Ethics & Compliance Program, which DoD glossed over. For these reasons, DoD's failure to meaningfully consider these mitigating factors and remedial measures was arbitrary and capricious. *See, e.g.*, *SecurityPoint Holdings, Inc. v. Transportation Sec. Admin.*, 769 F.3d 1184, 1187 (D.C. Cir. 2014) (explaining in an APA case that "[a]n agency's action is arbitrary and

capricious if it has entirely failed to consider an important aspect of the problem it faces") (internal quotations omitted).

Fifth, it is well-established under case law that where, as here, a contractor participates in and performs government contracts satisfactorily ***since the events giving rise to a cause for concern***, the underlying events are not indicative of the contractor's present responsibility, and the debarring official should consider the contractor's performance of those contracts during the intervening years. *See, e.g., Silverman v. United States Department of Defense,* 817 F. Supp. 846, 847 (S.D. Ca. 1993) (holding that the decision to debar was "arbitrary, capricious and an abuse of discretion" and citing to "[t]he fact that DLA continued to enter into contracts with plaintiffs for a period of six years following the events underlying the misdemeanor conviction calls into question the agency's conclusion that plaintiffs were not presently responsible in May 1992"). Here, the AR shows that Precision has significantly improved its on-time delivery rate and performance record since the NPD was issued, including an 83-percent on-time rate for 2021, 100-percent on-time rate for 2022, and successful on-time performance of 41 orders, and a substantial reduction in its backlog. DoD's Debarment Decisions were arbitrary and capricious because they gloss over Precision's recent successful performance record of many orders and its substantially improved on-time delivery rates and reduced backlog.

Sixth, rather than consider the Administrative Agreement terms proposed by Plaintiffs (and supported by the distinguished monitoring team), the Debarment Decisions reflect that DoD summarily rejected the proposal without articulating why such an Administrative Agreement did not resolve its concerns. In so doing, DoD did not explain why the specific features of the proposed Administrative Agreement are not sufficient to protect the Government's interests. Nor did DoD indicate which additional or different terms would address its concerns. This is

particularly concerning given Plaintiffs expressed a willingness to consider any terms proposed by the SDO, and we know DLA is open to Administrative Agreements, as it entered into approximately a dozen during 2019 and 2020. *See* Compl. Exh. 3, MIO at 80 ("In addition to DLA's standard terms for an Agreement, Respondents are amenable to discussing and considering any additional fact-specific terms your office deems necessary."); *see also FY2019 Section 873 Report to Congress, ISDC* (Jan. 15, 2021), available at https://www.acquisition.gov/sites/default/files/page_file_uploads/ISDC%20FY19%20873%20Report.pdf; *FY2020 Section 873 Report to Congress, ISDC (Mar. 22, 2022), available at* https://www.acquisition.gov/sites/default/files/page_file_uploads/ISDC_FY_2020_Section_873_Report_(use_for_web_upload).pdf. It is unclear why DLA entered into an Administrative Agreement in those other cases and chose not to even consider and discuss such a possibility with Plaintiffs here. As such, DoD engaged in arbitrary and capricious decision making.

Moreover, this arbitrary decision-making is further evidenced by the fact that DLA has entered into at least ten Administrative Agreements in the past three years with contractors facing far more serious allegations, such as defective pricing (falsified pricing data), bid rigging and other antitrust violations, falsified testing, money laundering, Trade Agreements Act violations (supplying Chinese parts when Buy American or Trade Agreements Act countries only permitted), and contractors who delivered poor-quality parts and had on-time delivery issues. *See* Compl. Exh. 18, Analysis of DLA Administrative Agreements.

Unless this Court enjoins the unlawful Debarment Decisions, "Precision will be put out of business" and Plaintiffs, their families, and Precision's 42 valued employees will sustain imminent irreparable harm. Compl. Exh. 5, Declaration of Anthony C. Figlozzi at ¶ 22. Indeed, as set forth in Tony's Declaration, the Debarment Decisions will lead to, among other things, the

"***closing of [Precision's] doors and bankruptcy, the layoffs of Precision's 42-valued employees, and the loss of the sole means to provide for our families who rely on and depend upon our incomes from Precision to survive. In other words, continued debarment will be the end of Precision***." *Id.* at ¶ 26 (emphasis added). Such irreparable harm already has occurred and continues to occur with each passing day. Precision continues to lose out on new government contracting and subcontracting opportunities, including most recently a subcontracting opportunity with Northrop Grumman Corporation for more than ***$1,700,000.00***. Without an injunction, the closure of Precision's business is imminent. *See id.* at ¶ 34.

Accordingly, this Court should grant Plaintiffs' Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction and: (1) preliminarily enjoin Plaintiffs' Debarments rendering Plaintiffs immediately eligible for government contracting and schedule this matter for resolution on the merits; (2) vacate and set aside the Plaintiffs' proposed debarments and Debarments declaring them null and void and order that they be removed from the System for Award Management available at www.sam.gov; (3) preliminarily enjoin DoD from proposing for debarment and debarring Plaintiffs based on the conduct alleged in the NPD and Debarment Decisions; and (4) award Plaintiffs their reasonable attorneys' fees, including attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, all costs and expenses, and grant such other relief as the Court deems just and proper.

## STATEMENT OF RELEVANT FACTS[3]

### I. THE NOTICE OF PROPOSED DEBARMENT

Despite Precision's incredible track record of success over 35 years and nearly 300,000 ***high-quality parts*** delivered, DLA's Debarment Office issued each Plaintiff a NPD from DoD

[3] For a full discussion of the statement of relevant facts, see Plaintiffs' Complaint.

dated May 25, 2021. Compl. Exh. 11, NPD at 1. DoD's Memorandum was ***focused exclusively on Precision's on-time delivery*** record during 2019 and 2020, and relied on ***five specific orders*** between DLA and Precision (of thousands), each of which was identified and addressed expressly in DoD's Memorandum. Compl. Exh. 12, DoD Memorandum at 1 ("Below are five examples where DLA Aviation recently withdrew or cancelled a Precision Metals' purchase order because it was delinquent"). Importantly, DoD's Memorandum ***did not cite to any other specific DLA orders as causes for concern***. And DLA's ultimate Debarment Decisions make clear that these five orders "***form the basis of this action***." Compl. Exh. 2, Precision Debarment Decision at 4. Nor did DLA make any allegations about ethics or integrity issues, or the quality of parts delivered by Precision, and Precision has a near perfect quality ***score of over 99-percent***. Rather, the basis for the cause for debarment were the five specific DLA orders.

Based upon these five orders and the unsupported conclusion that Precision was solely at fault, DoD's Memorandum stated that there was a cause for debarment under FAR 9.406-2(b)(l)(i) against Precision because its "actions demonstrate a history of failure to perform, and unsatisfactory performance of, one or more contracts with the Government." *See* Compl. Exh. 12, DoD Memorandum at 9. For the same reasons, DoD's Memorandum stated that Precision's "consistent failure to perform its unilateral purchase orders on time is of so serious or compelling nature it provides a separate cause for its debarment, pursuant to FAR 9.406-2(c)." *Id.* Additionally, DoD's Memorandum imputed Precision's debarment to Thomas and Tony given their roles for Precision. *Id.*

Importantly, the NPD invited Plaintiffs to request an "in-person meeting," stating that they "may submit, either ***in person*** or in writing, ***or both***, information and argument in opposition to the proposed debarment." Compl. Exh. 11, NPD at 2-3 (emphasis added). Indeed,

the NPD – recognizing the importance of meeting with the SDO – informed Plaintiffs that if they cannot travel to meet in-person, "[i]n lieu of an in person submission, you or a representative on your behalf ***may request or be requested to submit matters via telephone or video-teleconference***." *Id*. at 3 (emphasis added). In no uncertain terms, the NPD made clear that Plaintiffs were entitled to meet with the SDO. In accordance with DFARS Subpart 209.4, the NPD attached a copy of DFARS Appendix H entitled "Debarment and Suspension Procedures," which stated that "[i]n accordance with FAR 9.406-3(c) and 9.407-3(c), matters in opposition may be presented ***in person***, in writing, or through a representative . . . ***[or] through any combination of the foregoing methods***." Compl. Exh. 11, NPD at Att. 2 (emphasis added).

## II. PLAINTIFFS' PRESENTATION OF MATTERS IN OPPOSITION TO THE NPD

On March 11, 2022, Plaintiffs submitted a timely ***85-page*** MIO in response to the NPD requesting an in-person meeting with the SDO and ***denying and disputing the allegations*** that Precision was responsible for the delays associated with the five orders; for each order, Precision shared all of the material facts with DLA walking DLA through the events that unfolded leading to the cancellation of the orders. *See generally* Compl. Exh. 3, MIO. The MIO demonstrated that the AR underlying the NPD did not provide a cause for debarment and, at a minimum, DoD's ***one-sided allegations*** were in genuine dispute giving rise to the regulatory requirement that a fact-finding hearing be conducted before any factual findings are made. *Id.* at 80-81.

Among other things, Precision demonstrated that the outcome of the orders was largely attributable to DLA furnishing incomplete, ambiguous, and/or otherwise defective technical specifications to build the parts and DLA's non-responsiveness and extreme delay in furnishing support and contract administration to resolve those issues in a timely manner. *Id.* at 27-38. The MIO also showed that Plaintiffs are presently responsible and, notwithstanding that Precision

already maintained a best-practices AS9100-Rev. D Certified QMS – ***the highest standard in aerospace manufacturing*** – that has been independently evaluated and certified, that Precision implemented remedial measures, including enhanced QMS procedures designed to significantly mitigate reoccurrence of the issues underlying the delays it has experienced in supporting DLA orders, including the five orders set forth in the NPD. *Id.* at 38-47.

Furthermore, and while Plaintiffs denied and disputed the allegations and demonstrated that they are presently responsibly and do not present a threat to DoD, Plaintiffs nonetheless proposed a resolution through entering into a three-year Administrative Agreement subject to monitoring to address any lingering responsibility concerns. *Id.* at 79-80.

### III. The Debarment Decisions

On April 21, 2022, while Plaintiffs were awaiting and preparing for the in-person meeting with DoD, DoD issued the Debarment Decisions to Plaintiffs. Compl. Exh. 2, Precision Debarment Decision. A set forth below, the Debarment Decisions reflect a superficial and scant evaluation of Plaintiffs' comprehensive 85-page MIO and unfortunately appear to confirm that DoD had pre-judged the outcome of this case *before* the agency had even read Plaintiffs' MIO. Indeed, rather than engage with the specific information Plaintiffs presented addressing each and every issue, DoD appears to have looked for ways to readily dismiss such information to reach DoD's desired ultimate conclusion. Thus, for the many reasons set forth in Plaintiffs' Complaint and herein, the Court should find that the Debarment Decisions were arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation in violation of the APA and Plaintiffs' constitutional due process rights.

## ARGUMENT

### I. Standard of Review

#### A. Temporary Restraining Order/Preliminary Injunction

To obtain a temporary restraining order, the moving party "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that an injunction is in the public interest." *Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 225 (2d Cir. 2021) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The same standard applies to both temporary restraining orders and to preliminary injunctions. *Just. v. Kuhnapfel*, 985 F. Supp. 2d 334, 339 (E.D.N.Y. 2013).

### B. ADMINISTRATIVE PROCEDURE ACT

The APA entitles "'a party to bring an equitable claim challenging arbitrary and capricious action of an administrative agency in federal district court and waives the government's sovereign immunity with respect to such claims in that forum.'" *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999)); *see also Friedler*, 271 F. Supp. 3d at 52 ("Thus, under the APA, a challenged agency action—including the debarment decision of an agency's debarring official—must be set aside if it is found to be, inter alia, 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"). Courts have explained that ***"[j]udicial review becomes less deferential when the dispute concerns legal questions about the meaning of the FAR's procedural provisions."*** *Campbell v. Schmidt*, No. 1:20-CV-1785 (CRC), 2020 WL 6445874, at *5 (D.D.C. Nov. 3, 2020) (emphasis added) (citing *Friedler*, 271 F. Supp. 3d at 52-53 ("[O]nly minimal deference is due to GSA's interpretation of the FAR when a court undertakes to determine whether the agency followed that regulation's procedural requirements prior to imposing a debarment.").[4] Indeed, as pertinent here, courts have further

[4] We have found no relevant case law in the Second Circuit involving a challenge to a Federal agency debarment decision under the FAR and DFARS. Rather, the limited suspension and

explained that ***"[a] legal error that deprives the contractor of procedures required by the FAR may render the debarment 'arbitrary and capricious as a matter of law.'"*** *Campbell*, 2020 WL 6445874, at *5 (quoting *Friedler*, 271 F. Supp. 3d at 53) (emphasis added).

Moreover, "[i]t is well settled that, once having formulated the regulation, the [agency] is bound to follow it." *Fayer v. Romney*, 365 F. Supp. 317, 319 (S.D.N.Y. 1973). As such, "[a]n agency 'is not free to ignore or violate its regulations while they remain in effect[,]' and thus, no matter how well-reasoned or fully-articulated its decision making process is, '***an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations***. *Friedler*, 271 F. Supp. 3d at 61 (quoting *Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009) (emphasis added). "Thus, where, as here, [an agency] ignores its own regulations and imposes a debarment that does not adhere to the procedural due process

---

debarment caselaw in this circuit involves challenges to statutory debarment provisions governed by different rules, as opposed to the discretionary debarment system under the FAR and DFARS, and a unique challenge to a FAR-suspension based on a criminal indictment. *Cf. Janik Paving & Const., Inc. v. Brock*, 828 F.2d 84 (2d Cir. 1987) (involving a statutory debarment under the Contract Work Hours and Safety Standards Act by the Department of Labor that did not involve any alleged FAR or DFARS violations); *Karawia v. U.S. Dept. of Labor*, 627 F. Supp. 2d 137 (S.D.N.Y. 2009) (involving a statutory debarment under the Service Contract Act by the Department of Labor that did not involve any alleged FAR or DFARS violations); *Rutigliano Paper Stock, Inc. v. U.S. Gen. Services Admin.*, 967 F. Supp. 757 (E.D.N.Y 1997) (involving a challenge to suspension regulations involving a ***criminal indictment-based suspension*** by the General Services Administration, not the FAR and DFARS debarment provisions involved herein). In the absence of Second Circuit guidance on these issues, we have cited to the D.C. Circuit's well-developed precedent on these issues. *See, e.g., United States v. Northern Adult Daily Health Care Center*, 205 F. Supp. 3d 276, 298 (E.D.N.Y., 2016) ("In the absence of Second Circuit guidance on this element of the retaliation claim, many courts in the Circuit have adopted the positions of the First Circuit Court of Appeals and the D.C. Circuit Court of Appeals."); *Doyle v. United States Dep't of Homeland Security*, 959 F. 3d 72, 79 (2nd Cir. 2020) ("As the parties appear to agree is appropriate, we turn to the D.C. Circuit's well-developed precedent in the Armstrong decisions for guidance in evaluating the plaintiffs' challenges under the FRA and the PRA.").

mandates of FAR 9.406–3, ***it has acted arbitrarily and capriciously***, no matter how well-reasoned and seemingly well-supported its ultimate conclusion might be." *Id.* (emphasis added).

"Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life." *Reuters*, 781 F.2d at 950–51; *see also Int'l Exports, Inc. v. Mattis*, No. 14-2064, 265 F.Supp.3d 35, 49–50, (D.D.C. 2017) (remanding a debarment decision to the agency for further proceedings where the debarring official failed to adhere to the procedural requirements of FAR 9.406–3, and stating that "[a]d hoc departures" from an agency's rules and regulations "cannot be sanctioned" (internal quotation marks and citation omitted)).

## II. PLAINTIFFS HAVE DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

The Second Circuit has explained that a ***plaintiff's likelihood of success*** on the merits is "the dominant, if not the dispositive, factor" at the preliminary injunction stage. *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). The D.C. Circuit has further explained that "[t]o justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, . . . it will ordinarily be enough that the ***plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation*** . . . ." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). The Plaintiffs in this case have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." For the reasons in Plaintiffs' Complaint and herein, Plaintiffs have met their burden of showing a substantial likelihood of success on the merits of their claims that DoD's Debarment Decisions were arbitrary, capricious, an abuse of discretion, unsupported by

substantial evidence, and contrary to law and regulation, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, and Plaintiffs' constitutional due process rights.

### A. THE DEBARMENT DECISIONS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT AND PLAINTIFFS' DUE PROCESS RIGHTS

#### 1. DOD VIOLATED ITS OWN PROCEDURES SET FORTH IN THE NPD AND THE FAR, DFARS, AND PRECISION'S DUE PROCESS RIGHTS WHEN IT DENIED PLAINTIFFS A FAR 9.406-3(C) IN-PERSON MEETING

Plaintiffs, on multiple occasions, requested an in-person meeting with the SDO in accordance with the procedures set forth in the NPD, the FAR, and the DFARS. *See, e.g.*, Compl. Exh. 3, MIO at 2 ("After you have had the opportunity to review and consider our submission, we would like to schedule a meeting with your office in further support of our clients' present responsibility. *See* FAR 9.406-3(c)(4)."); Compl. at ¶ 186.

There can be no dispute that this right to participate in an in-person meeting with the decision-maker *before* a final decision is reached is a crucial part of the due process and fairness embedded into the FAR and DFARS. *See* Compl. Exh. 11, NPD at 2-3 (inviting Plaintiffs to request an "in-person meeting," stating that they "may submit, either ***in person*** or in writing, ***or both***, information and argument in opposition to the proposed debarment") (emphasis added); DFARS Appendix H-103(a) ("In accordance with FAR 9.406-3(c) and 9.407-3(c), matters in opposition may be presented ***in person***, in writing, or through a representative. Matters in opposition may be presented through ***any combination of the foregoing methods*** . . . .") (emphasis added); FAR 9.406-3(c) ("[T]he contractor ***may submit, in person***, in writing, or through a representative, information and argument in opposition to the proposed debarment, including any additional specific information that raises a genuine dispute over the material facts) (emphasis added); *see also Rutigliano Paper Stock, Inc.*, 967 F. Supp. at 763 (recognizing

in a case involving a challenge to a suspension that a contractor is entitled to an in-person meeting when requested).

Indeed, as reflected in DFARS Appendix H, the in-person meeting provides the contractor proposed for debarment with an invaluable opportunity to come into the agency's office to meet with the SDO and his/her staff face-to-face, discuss the matter fully and openly, present additional information and argument that may raise a genuine dispute over material facts, and address any remaining concerns and questions that the SDO may have. *See* DFARS Appendix H-103(b) ("An in-person presentation is an informal meeting, non-adversarial in nature. The debarring and suspending official and/or other agency representatives may ask questions of the contractor or its representative making the presentation.").

Yet, DoD inexplicably and unlawfully issued the Debarment Decisions ***without even addressing*** Plaintiffs' request for an in-person meeting, let alone conducting the required FAR 9.406-3(c) in-person meeting. The fact DoD did not afford Plaintiffs the opportunity for the in-person meeting is an undeniable violation of the governing regulations. In so doing, DoD unlawfully short-circuited the process set forth in the NPD, the FAR and DFARS and stripped Plaintiffs of their due process rights. Indeed, this Court has explained that "where, as here, [an agency] ignores its own regulations and imposes a debarment that does not adhere to the procedural due process mandates of FAR 9.406–3, it has acted arbitrarily and capriciously, no matter how well-reasoned and seemingly well-supported its ultimate conclusion might be." *Friedler*, 271 F. Supp. 3d at 61; s*ee also* Compl. Exh. 4, Transcript of Motions Hearing Before the Honorable Royce C. Lamberth United States District Judge at 62, *Resource Applications, Inc. v. Environmental Protection Agency*, No. 93-2525 (D.D.C. Jan. 11, 1994) ("Where the contractor is camped out on your door offering to give you information, wanting to

meet with you, wanting to answer your questions, it's arbitrary and capricious for the agency not to at least ask if they have answers to those questions before they go forward.").[5]

Moreover, as reflected in DFARS Appendix H-102, the presentation of matters in opposition during the in-person meeting may raise a genuine dispute of material facts that would trigger the requirement for a fact-finding hearing – assuming such a genuine dispute was not already created by the MIO, as here. DFARS Appendix H-102 ("There are two distinct proceedings which may be involved in the suspension or debarment process. The first is the presentation of matters in opposition to the suspension or proposed debarment by the contractor. The second is fact-finding which occurs only in cases in which the contractor's presentation of matters in opposition raises a genuine dispute over one or more material facts."). Thus, by unlawfully depriving Plaintiffs of their opportunity for an in-person meeting, DoD also deprived Plaintiffs of their opportunity to create additional disputes over material facts during such a meeting that would result in a fact-finding hearing.

Importantly, DoD's decision not to furnish Plaintiffs with the required in-person meeting *before* reaching a final decision was highly prejudicial. Had DoD met with Plaintiffs in-person, as is required, we believe Plaintiffs would have been able to address and resolve DoD's concerns as reflected in the Debarment Decisions. Indeed, as set forth in his Declaration, Mr. Lussier explained that, had DoD met with Plaintiffs as required by law, he would have participated in the

[5] Moreover, as set forth in his Declaration, it is Mr. Meunier's opinion that DoD denied Plaintiffs a fundamental aspect of the debarment process when it disregarded Plaintiffs' request for an in-person meeting: "DoD's failure to afford Plaintiff(s) an opportunity for an in-person meeting is a *violation of its own procedures and governing regulations* as set forth above and is contrary to the customs and practices of discretionary Federal debarment programs." Compl. Exh. 6, Declaration of Robert F. Meunier at ¶ 14 (emphasis added); *see also* Compl. Exh. 7, Declaration of Normand V. Lussier at ¶ 20 ("By denying Plaintiffs request for an in-person meeting, DoD, in effect, deprived Plaintiffs of due process including the ability to hear directly from the SDO as to his remaining concerns and the ability to address those concerns.").

meeting, along with Plaintiffs, and presented information on behalf of Plaintiffs that would have likely addressed and resolved DoD's stated concerns, or at a minimum, further created disputes over material facts thereby triggering the requirement for DOD to hold a fact-finding hearing in this case:

> Had DoD provided Plaintiffs this meeting as required by the FAR, the DFARS, Appendix H, and DoD's NPD, I would have attended and participated as Plaintiffs had intended and would have been in a position to share my observations with DoD based on my two monitoring visits. Indeed, I could have explained that the enhanced QMS procedures have (1) enabled Precision to reduce its overall backlog of open orders by more than 40-percent in less than six months and (2) led to on-time delivery rates of 83-percent and 100-percent for calendar years 2021 and 2022 for all orders following DLA approval of the first article. Based on my review of DoD's Debarment Decisions, which seemed to conclude that Precision's enhanced QMS measures were not working and that its on-time delivery rate was not improving, ***I believe the presentation I would have made during the in-person meeting would have addressed and resolved DoD's stated concerns***.
>
> By deviating from the required regulatory process prescribed by the FAR and DFARS, it is my opinion that DLA deprived Plaintiffs of an opportunity to present additional information – including information from my second report – and argument through an in-person meeting that may have demonstrated to DLA that debarment was not necessary to protect the Government's interests.

Compl. Exh. 7, Declaration of Normand V. Lussier at ¶ 21 (emphasis added); *see also* Compl. Exh. 15, Monitor's Second Report at 11 (finding that "Precision's 2021 on-time delivery rate reached 83% and its current 2022 on-time delivery rate is at 100-percent when looking at first articles approved and new delivery schedules established," and that Precision has "reduce[d] its overall backlog of open orders considerably by over 40% in less than six months").

Additionally, as set forth in his Declaration, Tony explained that he, too, would have been able to share information during an in-person meeting, information that would have addressed DoD's stated concerns:

> Had DoD provided us a meeting as required by the FAR, the DFARS, Appendix H, and the NPD, I would have been able to address in further detail our dispute of DoD's allegations – making pellucidly clear those are in genuine dispute – and shared that the enhanced Quality Management System ("QMS") procedures implemented by Precision have continued to improve the Company's on-time delivery rate and has led to a significant reduction of over 40-percent in Precision's backlog of open orders measured from the backlog existing in December 2021 as compared to today. Indeed, in approximately six months, ***Precision has reduced its overall backlog by over 40-percent from 163 to 97 orders***. Additionally, the enhanced QMS procedures have led to on-time delivery rates ***of 83-percent for 2021 and 100-percent for 2022 for all orders*** following DoD approval of the first article.

Compl. Exh. 5, Declaration of Anthony C. Figlozzi at ¶ 15 (emphases added).

In sum, the record reflects that DoD's actions resulted in multiple deprivations of Plaintiffs' due process rights that prejudiced Plaintiffs. While the MIO spoke to Precision's improved on-time delivery rates and reduced backlog, Plaintiffs would have been able to share that the enhanced QMS procedures have continued to improve considerably the Company's on-time delivery rate and has led to a ***significant reduction of over 40-percent*** in Precision's backlog of open orders measured from the backlog existing in December 2021 as compared to today. Specifically, Plaintiffs would have been able to share that the enhanced QMS procedures have led to on-time delivery rates of ***83-percent for 2021 and 100-percent for 2022*** for all orders following DoD approval of the first article.

We believe such information would have been well received by DoD as the Debarment Decisions questioned the effectiveness of the enhanced QMS measures and whether they were working in improving Precision's on-time delivery and backlog. Notably, these on-time delivery rates ***exceed DLA's stated goal of a 75% on-time delivery rate for its very top suppliers***. *See* Compl. Exh. 1, Cathy Hopkins, Face-to-Face Interactions, Encourage Relationship Building, Improve Warfighter Support, Defense Logistics Agency (2017),

https://www.dla.mil/AboutDLA/News/ NewsArticleView/Article/1350957/face-to-face-interactions-encourage-relationship-building-improve-warfighter-su/ (last visited May 25, 2022) (noting that "DCMA has an internal performance requirement to try to achieve 75 percent on-time-delivery from their top DCMA 500 highest volume supplier").

This data contradicts DoD's central conclusion in the Debarment Decisions that Precision's "enhanced QMS procedures are not working to increase their on-time delivery rates," and instead shows that once DoD approves and accepts Precision's presented first article and establishes a production delivery schedule, that Precision's enhanced QMS procedures are working as intended and substantially improving on-time delivery. *See* Compl. Exh. 2, Precision Debarment Decision at 8. Stated differently, once DLA has furnished all of the required technical drawings and approved of the first article, Precision performs the production phase of the order on-time and without issues.

### 2. DoD Violated the NPD, FAR, DFARS, and Precision's Due Process Rights When It Denied Precision a FAR 9.406-3(d) Fact-Finding Hearing

Plaintiffs' MIO addressed, denied and disputed the specific allegations set forth in the NPD pertaining to five DLA orders – which "***form the basis of this action***" – and presented extensive information showing that DLA was at fault for the delays associated with these orders, which ultimately led to ***no cost cancellation*** of these five orders. *See, e.g.,* Compl. at ¶¶ 102-125; Compl. Exh. 3, MIO at 29-38. None of the orders were terminated for default or cause by DLA, which is the type of action to be taken if the contractor is at fault. The fact DLA opted to go the no-cost cancellation route confirms that Precision, to the contrary, was not to blame for these orders. Moreover, it is inappropriate for DLA to later use the cancellation of the orders as a basis for debarment when Precision believed these were cancelled at no cost or harm to either party.

Plaintiffs also addressed and disputed DoD's allegation that Precision solely was at fault for its backlog and on-time delivery rates in 2019 and 2020, by presenting extensive information demonstrating that DLA's actions contributed significantly to Precision's backlog, among other contributing causes such as unavoidable supplier delays, supply chain issues, COVID-19 related delays, and the serious health issues experienced by Precision's then leader, Thomas. Indeed, Plaintiffs asserted that DLA was responsible for at least 50-percent of the late orders in the backlog. *See, e.g.,* Compl. at ¶¶ 129-132; Compl. Exh. 3, MIO at 27-28. For these reasons, it should have been clear to DoD that Plaintiffs' MIO created a genuine dispute over the facts material to the proposed debarment, which triggered the requirement for a fact-finding hearing under the NPD, the FAR, and the DFARS.

At the outset of the Debarment Decisions, DoD recognized that Plaintiffs disputed the allegations contributing the delays of the five orders that "form the basis of this action" and stated that "[w]hen addressing each of the contracts that form the basis of this action, ***the Respondents' MIO accepts no fault for why the orders turned out the way they did*** . . . . Compl. Exh. 2, Precision Debarment Decision at 4 (emphasis added).[6] Yet, despite acknowledging that Plaintiffs' MIO disputed the allegations underlying the NPD, DoD improperly disregarded the information and arguments set forth in the MIO and summarily concluded that Plaintiffs had "cite[d] to no disputed material fact which would give rise to a fact finding." Compl. Exh. 2, Precision Debarment Decision at 6 (emphasis added).

---

[6] The Debarment Decisions suggest, in passing, that Plaintiffs acknowledged being at fault for one of the orders being cancelled, which is not the case. As reflected in the MIO and Complaint, DLA issued a stop-work order which caused the order to be placed in a do not work file at Precision. *See* Compl. at ¶¶ 123-125; Compl. Exh. 3, MIO at 36-38. Ultimately, Precision discovered that DLA lifted the stop-work order and that it would not be able to then meet the delivery schedule and presented DLA with a solution to delivering the parts but DLA decided to cancel.

In other words, rather than conduct the required fact-finding hearing under FAR 9.406-3(d) and DFARS Appendix H-104(a), DoD arbitrarily skipped that important step and instead simply conducted its own assessment about the credibility of the evidence presented by Plaintiffs in their MIO. Such an approach, however, is inconsistent with the requirements of the FAR and DFARS. *See* FAR 9.406-3(b)(2) ("In actions not based upon a conviction or civil judgment, if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the proposed debarment, ***agencies shall also-(i) Afford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the agency presents; and (ii) Make a transcribed record of the proceedings and make it available at cost to the contractor upon request, unless the contractor and the agency, by mutual agreement, waive the requirement for a transcript***") (emphasis added); FAR 9.406-3(d)(2)(i) ("In actions in which additional proceedings are necessary as to disputed material facts, written findings of fact shall be prepared by the Suspension Debarment Official"); DFARS Appendix H-104(a) ("If the debarring and suspending official has determined a genuine dispute of material fact(s) exists, a designated fact-finder will conduct the fact-finding proceeding").

As several courts have properly recognized, the fact-finding hearing is the appropriate forum for the SDO to weigh the evidence presented by both parties and to make credibility assessments about the information and argument presented by the parties. *See, e.g.*, *Sterlingwear*, 11 Cl. Ct. at 887 ("The debarring official, faced with this evidence [found in a transcript in the Administrative Record], should have recognized that, while circumstantial for the most part, ***this evidence was nonetheless certainly sufficient to raise an issue of fact***") (emphasis added); *Albert Gonzales v. United States Department of Housing and Urban*

*Development*, Civ. Act. 00-WM-495, 2000 U.S. Dist. LEXIS 18935 (December 1, 2000) ("***The Debarring Official cannot ignore legitimate evidence*** which raised a genuine dispute of material fact") (emphasis added); *see also* Compl. Exh. 6, Declaration of Robert F. Meunier at ¶ 23 (explaining that "the fact-finding hearing is the appropriate forum for the SDO to weigh the evidence presented by both parties and to make credibility assessments about the information and argument presented by the parties").

Indeed, the due process violations reflected in the Debarment Decisions are virtually identical to those found in the U.S. Court of Appeals for the Ninth Circuit's decision in *Sameena*, which found that "*the appellants' submission* . . . raise[d] a genuine factual dispute regarding the issue" underlying the notice of proposed debarment that should have led to a fact-finding hearing:

> ***The appellants requested an evidentiary hearing to address this question***. The Debarring Official decided, however, that a hearing was unwarranted, finding the appellants' ***denials of the charges against them to be "unsupported by credible evidence***." We do not doubt that the Air Force is in a better position than this Court to assess the credibility of the evidence offered by the appellants.
>
> ***We are convinced, however, that an evidentiary hearing would have been the appropriate forum in which to make such an assessment***, particularly in view of the serious consequences attaching to a debarment . . . . The FAR states unambiguously that such a hearing "shall" be afforded if genuine factual disputes arise.
>
> Accordingly, we conclude that *the Air Force violated the appellants constitutional right to due process* in failing to comply with binding regulations and that the appellants are entitled to such a hearing on remand. As Justice Frankfurter observed in a similar context, "*He that takes the procedural sword shall perish with that sword*." *Vitarelli*, 359 U.S. at 54 7, 79 S. Ct. 968 (Frankfurter, J., concurring).

147 F.3d at 1154-55 (emphasis added).

Similarly, in *Ali*, the Ninth Circuit reaffirmed its holding in *Sameena* that a contractor's MIO creates a genuine dispute of material fact where, as here, it addresses and disputes the allegation:

> Consistent with our holding in *Sameena, Inc.*, No. 97-15252, we conclude that HHS violated Ali's right to due process by failing to hold an evidentiary hearing to resolve whether Ali had reason to know of his employees' fraudulent conduct.
>
> ***Our review of the record indicates that Ali raised a genuine issue of material fact in his opposition to the proposed debarment***. . . .
>
> . . . *The FAR clearly requires that HHS hold an evidentiary hearing under such circumstances*, particularly in view of the fact that Ali never had an opportunity to respond to Phipps' declaration. See 48 C.F.R. § 9.406-3(b)(2). By failing to abide by its own regulations, HHS violated Ali's constitutional right to due process.

1998 WL 416473 at *2 (emphasis added). The U.S. Court of Federal Claims also has "vacated" a debarment where, as here, "the debarring official also erred in failing to acknowledge several material issues of fact raised by plaintiffs' written submission." *Sterlingwear*, 11 Cl. Ct. at 885.

Furthermore, both Mr. Meunier and Mr. Lussier explained in their Declarations that it is their opinions that Plaintiffs' MIO created a genuine dispute over the material facts alleged in the NPD that should have resulted in a fact-finding hearing. *See* Compl. Exh. 6, Declaration of Robert F. Meunier at ¶ 24 (stating that "DoD should have found that Plaintiffs' MIO raised a genuine dispute over material facts and informed Plaintiffs that a fact-finding hearing would be conducted"); Compl. Exh. 7, Declaration of Normand V. Lussier at ¶¶ 23-24 ("Based upon my relevant experience serving as counsel to the DLA SDO where I oversaw thousands of suspension and debarment cases, it is my opinion that Plaintiffs' 85-page MIO created a genuine dispute over the material facts alleged in the NPD.").

For these reasons, the Court should find that the Debarment Decisions violated Plaintiffs' due process rights and the APA because they are arbitrary, capricious, an abuse of agency discretion, unsupported by substantial evidence, and not in accordance with law and regulation.

### 3. DoD Improperly Ignored the Information and Argument that Plaintiffs Submitted Concerning the Five Orders Underlying the Proposed Debarment

The Debarment Decisions show that DoD based its decisions on the erroneous contention that Plaintiffs "failed to provide sufficient evidence to support their arguments." Compl. Exh. 2, Precision Debarment Decision at 9. DoD's contention, however, cannot be squared with the AR. Indeed, Plaintiffs submitted an 85-page MIO, eight pages of which were dedicated to the five orders underlying the NPD. *See* Compl. Exh. 3, MIO at 30-37. DOD's decision to disregard these pages entirely claiming "no proof" is erroneous and appears to reflect a decision to avoid grappling with the dispute created by Plaintiffs' MIO.

First, to the extent DoD determined that the MIO was inadequate evidence – a position we dispute – the MIO stated at the beginning of the discussion concerning the five orders that: "***If your office would like copies of the documents underlying this discussion, we will furnish such upon request.***" *Id.* at 29 n.5 (emphasis added). In other words, to the extent that DoD had questions or concerns about the evidence supporting Plaintiffs' assertions – which reflected communications between DLA and Precision – DoD unreasonably overlooked the fact that Plaintiffs expressly informed DoD that if it desired additional supporting documentation, it would be furnished upon request. In any event, there is no requirement that Plaintiffs attach additional evidence to their MIO – rather, the information and argument contained in the MIO is adequate to create a genuine dispute. Thus, DoD engaged in arbitrary and capricious decision making when it discredited Plaintiffs' information and argument, let alone without first asking for the supporting documentation if it desired such. *See, e.g.*, Compl. Exh. 4, Transcript of

Motions Hearing Before the Honorable Royce C. Lamberth United States District Judge at -62, *Resource Applications, Inc. v. Environmental Protection Agency*, No. 93-2525 (D.D.C. Jan. 11, 1994) ("Where the contractor is camped out on your door offering to give you information, wanting to meet with you, wanting to answer your questions, it's arbitrary and capricious for the agency not to at least ask if they have answers to those questions before they go forward.").

Second, DoD ignores the fact that the MIO provided information and argument about *DLA*-related delays. In other words, DoD, itself, had all of the supporting information, including communications between DLA and Precision, that Plaintiffs were willing to provide upon request. Indeed, some of those communications were even included in the AR. For example, within Tab 27, the AR includes a letter sent by Precision to DLA concerning Order No. SPE4A7-17-2225 wherein Precision explained that it subcontracted with an approved vendor – Parker Hannifin – to manufacture the item in accordance with the specifications and that it therefore was not at fault for the item not meeting specifications. *See* AR Tab 27 at 256 (challenging the Government's First Article Rejection report and stating that "[a]ccording to the parts list (PL688580050 Rev. D) the approved source list includes PARKER HANNIFIN CORP. SAN DIEGO CA. who, when contacted directed PMC to their PARKER CHOMERICS division for the form in place gasket service.").

Notwithstanding that some of these communications were even in the AR, DoD still concluded that Plaintiffs' discussion concerning Order No. SPE4A7-17-2225 was presented "***without any evidence***." Compl. Exh. 2, Precision Debarment Decision at 4 (emphasis added). Thus, again, to the extent that DoD had some reason to question the veracity of Plaintiffs' statements in the MIO, the SDO simply could have asked someone within DLA Aviation – who referred the matter to his office – to verify the statements. DoD's failure to do so was arbitrary

and capricious. Moreover, had the SDO held the required in-person meeting and requested such evidence, Precision also could have shared it.

Fourth, FAR 9.406-3(b)(1) states that the "procedures governing the debarment decision making process" are "***as informal as is practicable***, consistent with principles of fundamental fairness" and "shall afford the contractor (and any specifically named affiliates) an opportunity to submit, in person, in writing, or through a representative, ***information and argument*** in opposition to the proposed debarment." (Emphasis added); *see also* DFARS Appendix H-103(b) ("An in-person presentation is an ***informal*** meeting, nonadversarial in nature") (emphasis added). By their plain terms, the debarment procedures in the FAR and DFARS are "informal," and there is nothing in FAR 9.406-3(b)(1) or the DFARS that requires a contractor to submit documentation to support all of its statements and arguments. Thus, for this additional reason, it was arbitrary and capricious for DoD to ignore the information and argument presented by Plaintiffs and to instead try to impose a higher standard found nowhere in FAR Subpart 9.4 or DFARS Subpart 209.4.[7]

Fifth, DoD also appears to have disregarded the information and argument in the MIO by contending that such should be presented as a claim under the Contract Disputes Act ("CDA"). However, as noted above, each of the five orders were cancelled at "no cost" to either party. *See* Compl. Exh. 12, DoD Memorandum at 4-6; Purchase Order SPE4A7-16-M-D212 at AR 198; Purchase Order SPE4A7-17-2225 at AR 269; Purchase Order SPE4A7-18-P-6051 at AR 319;

[7] There is no regulatory requirement that a respondent must offer further documentation in support of each of its statements set forth in the MIO. To the contrary, FAR 9.406-3(b)(2) suggests that documentary evidence may be presented at the fact-finding stage. *See* FAR 9.406 ("[I]f it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the proposed debarment, agencies shall also-(i) Afford the contractor an opportunity to appear with counsel, ***submit documentary evidence***, present witnesses, and confront any person the agency presents.") (emphasis added).

Purchase Order SPE4A6-18-P-Q330 at AR 357; & Order SPE4A7-18-P-F433 at AR 399. The CDA exists where a contractor is in a contract dispute with the Government and desires to dispute a position taken by the Government; the contractor does so by filing a claim with the contracting officer. Because DLA agreed to cancel the orders at no cost to either party, that action did not give rise to a claim. Had DLA rather stated it intended to terminate the orders for cause – faulting Precision – Precision would have responded differently and opposed such action. In light of these facts, Precision had no reason to bring a claim under the CDA.

Plaintiffs thus are not, as DoD claims, raising this information and argument as part of a performance dispute that should be resolved through the CDA. Rather, Plaintiffs simply raised this information and argument in its MIO because DoD was attempting to improperly use the cancelled orders as a cause for debarment. In short, DoD appears to be faulting Plaintiffs for responding with the facts to these allegations and suggesting that Plaintiffs need to file a CDA claim to rebut his allegations. But this contention finds no support in the law. Indeed, a respondent is entitled to provide information and argument in opposition to an agency's NPD. *See, e.g.*, FAR 9.406-3(c)(4) (stating that "the contractor may submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment, including any additional specific information that raises a genuine dispute over the material facts").

Sixth, when the U.S. District Court for the District of Columbia was presented with similar circumstances, Senior Judge Royce C. Lamberth explained that it was "arbitrary and capricious" for an SDO "to refuse to go back to the contractor when you say, 'I don't have enough information to decide it, so I'll just go ahead and suspend you anyway.'" *See* Compl. Exh. 4, Transcript of Motions Hearing Before the Honorable Royce C. Lamberth United States

District Judge at 63, *Resource Applications, Inc. v. Environmental Protection Agency*, No. 93-2525 (D.D.C. Jan. 11, 1994). For the same reasons, it was arbitrary and capricious for DoD in this case not to go back to Plaintiffs and ask them to provide whatever supporting evidence DoD believed was necessary for Plaintiffs to "prove their assertions."

For these reasons, DoD's decision making was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

#### 4. DLA Did Not Give Meaningful Consideration to the Mitigating Factors & Remedial Measures

While Plaintiffs disputed the existence of a cause for debarment, which required a fact-finding hearing before the SDO could render findings of fact – even if the SDO concludes that there is a cause for debarment and it is established by a preponderance of the evidence – the FAR requires the SDO to consider the existence of any ***mitigating factors and any remedial measures*** presented by the Plaintiffs in evaluating present responsibility. Consistent with DoD's approach to glossing over the genuine dispute created by Plaintiffs' MIO, DoD similarly glossed over Plaintiffs' presentation of mitigating factors and remedial measures. The Debarment Decisions demonstrate that DoD did not give meaningful consideration to the numerous mitigating factors presented by Plaintiffs and rather summarily found in favor of DoD.

##### A) DLA's Substantial Role In the Delays Associated with 5 Orders & Overall Backlog

The Debarment Decisions do not meaningfully consider DLA's role in delaying performance of the orders underlying the NPD or the fact that DLA delays, in general, have contributed significantly to the backlog in Precision's current open orders. Rather, DoD, once again, disregarded the information and argument in the MIO by contending that Plaintiffs "***provide no proof*** for their position is [sic] when they assert that approximately 50%, or 141 of

the outstanding orders Precision Metals has as overdue are because of DLA delays." Compl. Exh. 2, Precision Debarment Decision at 4 (emphasis added). For all the same reasons discussed above concerning DoD's unreasonable treatment of the information and argument presented by Plaintiffs concerning the five orders, it was arbitrary and capricious for DoD to ignore the information and argument presented by Plaintiffs concerning the DLA-related delays and impact on backlog.

Moreover, DoD ignored the impact that the DLA-related delays have had on Precision's other orders as such delays and trying to resolve them with DLA naturally distract Precision and take its limited resources from other orders creating an adverse "Domino" effect. *See, e.g., Sterlingwear* 11 Cl. Ct. at 888 (finding that the debarring official erred in failing to consider the ***"domino" theory presented by the contractor*** which stated that the government actions that led to the contractor's default of a single contract negatively impacted upon and substantially caused the contractor to default on eight other contracts, which the court further noted should have triggered a fact-finding hearing). The compounding "Domino" effect of DLA delays on other orders cannot be overstated and yet it was wholly ignored by DoD. For this additional reason, DoD's decision making was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

Additionally, DoD based its Debarment Decisions, in part, on its erroneous and conclusion that Precision only had "a 45% on-time delivery rate." Compl. Exh. 2, Precision Debarment Decision at 4. DoD, in essence, manufactured a strawman by citing to this fictional 45% delivery rate ***which Plaintiffs did not present***. This conclusion finds no support in the record. Indeed, Plaintiffs stated in their MIO that they expected to perform on-time 128 of Precision's open 282 orders ***(or 45%)*** but explained ***that it could not perform on-time 72 of its***

***open orders because of DLA-related delays***. *See* Compl. Exh. 3, MIO at 27-28. DoD, in its debarring decision, unreasonably and improperly faulted DLA's delays concerning 72 orders against Precision thereby reducing its on-time delivery rates. If DLA did not cause delays associated with those orders, Precision explained that it would be able to perform such 72 orders on time along with the 128 orders, which results in an on-time delivery rate of approximately 71% of its orders (200 of 282) DoD decided not to take into account DLA's role in delaying 72 orders and rather counted all of those orders against Precision.

Furthermore, had DoD not unlawfully short-circuited the debarment process and provided Plaintiffs an in-person meeting under FAR 9.406-3(c), Plaintiffs would have been able to address this misunderstanding and present updated information that demonstrated that Precision's 2021 and 2022 on-time delivery record following first article approval now exceeds 80%. Specifically, Plaintiffs would have presented information demonstrating that for all orders where DLA approved the first article in 2021 and set forth a new production schedule following first article acceptance ("FAA"), ***Precision has an on-time delivery record of 83%.*** Plaintiffs also would have shown that for all orders where DLA approved the first article in 2022 and set forth a new production schedule following FAA, ***Precision has an on-time delivery record of 100%.*** *See* Compl. Exh. 15, Monitor's Second Report. Notably, DLA does not even expect such high on-time delivery rates for its very top contractors. Compl. Exh. 1, Cathy Hopkins, Face-to-Face Interactions, Encourage Relationship Building, Improve Warfighter Support, Defense Logistics Agency (2017), https://www.dla.mil/AboutDLA/News/NewsArticleView/Article/1350957/face-to-face-interactions-encourage-relationship-building-improve-warfighter-su/ (last visited May 25, 2022) (noting that "DCMA has an internal performance requirement ***to try to***

***achieve 75 percent on-time-delivery*** from ***their top DCMA 500 highest volume supplier***") (emphases added).

For these reasons, DoD's decision making was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

### B) THE IMPACT OF THE COVID-19 PANDEMIC ON PRECISION, INCLUDING REDUCTION IN STAFFING, SUPPLY CHAIN ISSUES, AND IMPACT ON SUPPLIERS

The Debarment Decisions do not meaningfully consider the impact COVID-19 had on Precision's ability to timely deliver its orders. Rather, after noting that "the MIO submission relies heavily on the COVID-19 pandemic as a reason for its delays," DoD appears to discount entirely the impact of the pandemic by stating that "[i]t should be noted that each of these orders were awarded to Precision Metals prior to the COVID-19 pandemic." Compl. Exh. 2, Precision Debarment Decision at 2, 4. But that contention glossed over that Plaintiffs had demonstrated in their MIO that, as to those five orders, ***DLA's actions and delays led to those being cancelled***. Plaintiffs offered the information on the impact of the COVID-19 pandemic to address the concerns expressed regarding historical on-time delivery rates and backlog. DoD arbitrarily minimizes the significant impact that the COVID-19 pandemic had on Precision, its workforce, its suppliers, and its vendors. The combination of the DLA-related delays, "Domino" effects of such, coupled with COVID-19 cannot be overstated and yet DoD glossed over such.

Indeed, as set forth in the MIO, the COVID-19 pandemic exacerbated the existing issues Precision was experiencing at that time due to the plethora of DLA-related delays, supplier delays, supply chain issues, and Thomas' health ailments and created unprecedented challenges for the Company and for many other responsible contractors. But more importantly, the MIO showed the dramatic impact COVID-19 had on Precision's supply chain, suppliers and vendors, which created significant production delays that were outside of Precision's control. *See, e.g.*,

Compl. Exh. 3, MIO at 18 ("***Several of our vendors are either shutting down*** or cutting back on the number of employees and/or hours that they are working. This is causing a major pushback on our delivery schedules.") (emphasis added); *id*. ("***Precision Metals is currently operating at 25% production***. Delays are definite. ***The primary driver in the delays is that personnel are sick or caring for sick family members***; vendors are either closed or closing or have a shortage of staff, thereby pushing items out by weeks for delivery.") (emphasis added). For these reasons, DoD's failure to meaningfully consider this mitigating factor was arbitrary and capricious.

### C) THOMAS' SERIOUS HEALTH AILMENTS & IMPACT ON PRECISION

The MIO demonstrated that Thomas' service-related health ailments understandably contributed to Precision's current backlog of open orders. Indeed, in 2017 through 2021, Thomas experienced a series of life-threatening health crises including mini-strokes and heart attacks. However, other than simply noting that the MIO mentions "the health of the company's principal leader," the Debarment Decisions do not discuss Thomas' serious health ailments and the impact that they had on Precision's ability to timely deliver orders. Moreover, Precision rectified these issues by appointing a new leader, Tony, to be responsible for running the day-to-day business so that Thomas' health would no longer impact Precision. DoD's failure to meaningfully consider this mitigating factor was arbitrary and capricious.

### D) PRECISION'S ENHANCED QUALITY MANAGEMENT SYSTEM PROCEDURES

The Debarment Decisions further show that DoD did not meaningfully consider Precision's enhanced QMS procedures. Indeed, Precision spent eight pages discussing each of its thoughtful enhanced QMS elaborating on how each address historical events encountered in performing DLA orders. Rather that meaningfully evaluate these measures, DoD appears to have, once again, glossed over such and disregarded the information and argument in the MIO

and summarily concluded that the "enhanced QMS procedures are not working." Yet, DoD does not even identify those enhanced QMS measures. Compl. Exh. 2, Precision Debarment Decision at 5. Again, DoD avoided grappling with the information and argument presented by summarily stating that no or insufficient evidence was presented.

DoD's conclusion that the enhanced QMS procedures "are not working" is contradicted by Plaintiffs' MIO, including DSI's Initial Report, and cannot be squared with the record. First, DoD disregarded the information in the MIO that Precision, at the time of submission, had delivered 41 orders on-time since receiving the NPD, which illustrates that Precision's enhanced QMS procedures have helped it improve its on-time delivery and that Precision delivered the parts for these orders, on average, ***120 days before the delivery due date***. Compl. Exh. 3, MIO at 13. Rather than consider this information as evidence that the enhanced QMS procedures are working, DoD returned to its familiar (and erroneous) claim that "Respondents provide ***no evidence*** of this performance." Compl. Exh. 2, Precision Debarment Decision at 5 (emphasis added). For all the same reasons discussed above concerning DoD's unreasonable treatment of the information and argument presented by Plaintiffs concerning the five orders, it was arbitrary and capricious for DoD to ignore the information and argument presented by Plaintiffs concerning Precision's improved on-time delivery following the implementation of the enhanced QMS procedures.

Second, as noted above in Section II(A)(1), had DoD not unlawfully short-circuited the debarment process and provided Plaintiffs an in-person meeting under FAR 9.406-3(c), Plaintiffs would have presented updated information that demonstrated that Precision's 2021 and 2022 on-time delivery record is 83% and 100% respectively, which provides additional evidence that

Precision's enhanced QMS procedures are working and have helped the Company improve its on-time delivery.

Third, DoD did not meaningfully consider the recent subcontractor performance assessment reports from L3 Harris and Northrop Grumman. DoD concluded that the L3 Harris report was "unconvincing" because it "only focuses on Precision Metals' interaction with this specific contractor, L3 Harris" and "does not contain any of the background analysis or connection with DLA contract." *Id.* DoD similarly concluded that the Northrop Grumman report was "unconvincing" because "the report does not talk about DLA contracts." *Id.* at 6.

But these statements demonstrate that DoD was not open minded in conducting his assessment. Rather than accept and consider information reflecting positively on Precision, DoD chose to find ways to disregard and diminish such. Plaintiffs never suggested that the reports had any connection with DLA contracts but why is that material? Precision is performing DoD subcontracts for these primes, so the parts are ultimately going to DoD; the same occurs when DLA orders from Precision. Plaintiffs presented these reports because they demonstrate that the enhanced QMS procedures implemented by Precision are working, that Precision is a valuable supplier to Northrop Grumman and L3 Harris – major DoD prime contractors – and that debarment is unnecessary. Indeed, Northrop recently in May 2022 sought to place a more than $1,700,000.00 million dollar order with Precision but could not because of its eligibility – this shows that Northrop thinks highly of Precision and is satisfied with its on-time performance. Compl. Exh. 5, Declaration of Anthony C. Figlozzi at ¶ 25 ("Indeed, Precision has had to decline lucrative business opportunities because of its ineligibility, including multiple purchase orders from Northrop Grumman."). Importantly, Plaintiffs specifically noted that these prime contractor performance ratings provided DoD insight into how Precision performs ***when it is not***

***working directly with DLA***, orders that often are impacted by missing or defective technical data and delays in receiving administrative support because DLA is not the end user.[8]

For these reasons, DoD's decision making was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

### E) PRECISION'S ROBUST VALUES-BASED E&C PROGRAM

The Debarment Decisions show that DoD did not meaningfully consider Precision's robust values-based E&C Program. Instead, DoD made a single passing reference to the E&C Program, without considering how the Program significantly mitigates contract non-compliance events and, in turn, further protects the Government's interests therefore making debarment unnecessary:

> Overall, the enhanced QMS has Precision Metals being more proactive and more engaging with DLA, ***in addition to implementing an Ethics and Compliance program***. While adopting such procedures is commendable, ***the basis of this action is the Respondents' on-time delivery rate*** of DLA purchase orders.

Compl. Exh. 2, Precision Debarment Decision at 5-6 (emphasis added). In other words, in asserting that DLA is only concerned with Precision's on-time delivery rates and nothing else, DoD wholly disregarded Precision's investment in its E&C Program and completely missed the point; such an investment mitigates contract non-compliance events from occurring, which, in

[8] DoD also entirely disregarded the role DLA has played in Precision's on-time delivery record. Indeed, Plaintiffs introduced extensive information showing the extent of DLA's delays and errors regarding the technical data. There is only so much Precision can do to overcome such DLA-caused delays even with enhanced QMS measures, but yet DoD appears to have made Precision solely responsible for overcoming such. Indeed, the SDO's view appears to be to let DLA share defective TDPs and unreasonably delay performance for many months, but once DLA finally corrects such TDP – regardless of Precision's then manufacturing floor conditions – Precision better prioritize that old order and be able to perform timely.

turn, protects the Government. For these reasons, DoD's decision making was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

### F) PRECISION'S RETENTION OF MONITORS TO CONDUCT AN EVALUATION OF PRECISION'S QMS & E&C PROGRAMS AND TO REPORT TO DOD

The Debarment Decisions show that DoD did not meaningfully consider Precision's decision to retain two of the most credentialed and qualified monitors for purposes of conducting an evaluation of Precision's QMS and E&C Programs and report to DoD, or the insightful report from the monitoring team. Indeed, as noted in the Complaint, Mr. Lussier served as an Associate General Counsel ***for DLA for 22 years*** where he prepared over 3,000 letters of suspension, proposed debarment, and debarment with supporting memoranda for signature by the SDO. Mr. Blalock, on the other hand, served as the Chair of the ISDC and the Deputy Director of the Department of the Navy Acquisition Integrity Office where he supported the Navy's SDO, prepared letters of suspension, proposed debarment, and debarment, and oversaw the daily operations of the Navy's day-to-day debarment program reporting directly to the SDO.

Instead of giving meaningful consideration to the expertise and observations of these Monitors and their conclusions that "Precision is a responsible company," that "Precision's corrective action plan shows that it understands how it ended up in this situation and that it has implemented measures to prevent recurrence," and that the "Company has a carefully thought-out plan to address the outsourcing and pandemic difficulties it has experienced on past orders" (*see* Compl. Exh. 3, MIO at 58), DoD summarily rejected the findings in the Report and concluded that the "***report has little probative value***." Compl. Exh. 2, Precision Debarment Decision at 7 (emphasis added). But, once again, DoD's conclusions are indicative of a decision-maker who made up its mind before reading the MIO and then dismissed all information undermining that pre-determined conclusion.

First, the Monitors' reports are evidence and reflected their assessment of Precision, and their conclusions support finding Precision presently responsible. Second, the Monitors' reports support finding that Precision's enhanced QMS measures are working to improve its on-time delivery rates and to reduce its backlog. Third, Precision invited the SDO and his staff to visit Precision to see for themselves. Rather than take Precision up on its offer, the SDO's staff declined stating: "Thank you for your note and offer to visit your client's facilities. ***However, I do not believe we are interested in visiting Precision Metals' facility***." *See* Compl. Exh. 17, E-Mail Correspondence Dated January 27, 2022 (emphasis added). Such a visit would have afforded the SDO to gather all the "evidence" desired. DoD cannot have it both ways; either visit for yourself and make your own determination or accept the evaluation of the Monitors. DoD's decision to dismiss the Monitors' observations and conclusions while refusing to visit reflects true arbitrary and capricious decision-making.

For these reasons, DoD's decision making was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

### G) FAR 9.406-1 Mitigating Factors and Remedial Measures

The Debarment Decisions demonstrate that DoD did not meaningfully consider Precision's presentation on the FAR 9.406-1 mitigating factors and remedial measures. Precision's MIO discussed the mitigating factors and remedial measures throughout and then on top of that comprehensive discussion, Precision's MIO spent six pages walking through each factor and demonstrating how each weighed in favor of finding Plaintiffs' presently responsible. *See* Compl. Exh. 3, MIO at 61-66; *see also* Compl. at ¶¶ 157-172. Rather, the SDO, once again, disregarded the information and argument in the MIO and contended that the FAR 9.406-1 mitigating factors do not weigh in Plaintiffs' favor because Plaintiffs "did not provide sufficient evidence" to support the discussion of the 10 factors, the evidence offered by Plaintiffs had "little

probative value," and that the enhanced QMS procedures "are not working" to increase Precision's on-time delivery rates. Compl. Exh. 2, Precision Debarment Decision at 6-8.

As set forth above and in the Complaint, these statements are not supported by the record and ignore the substantial information and argument in the MIO showing that the 10 FAR 9.406-1 mitigating factors and remedial measures weigh in favor of finding Plaintiffs presently responsible. For these reasons, DoD's decision making was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

#### 5. DoD Failed to Meaningfully Consider the Proposed Administrative Agreement, Including Monitoring, and How Such Could Have Been Used to Address Any Remaining Concerns

The Debarment Decisions show that DoD did not meaningfully consider the Administrative Agreement proposed by Plaintiffs. In its MIO, Plaintiffs spent two pages discussing the proposed terms of an Administrative Agreement. Compl. Exh. 3, MIO at 79-80. As noted in the Complaint, FAR 9.406-3(f) and DFARS 209.406-1 recognize that SDOs may enter into Administrative Agreements with contractors to resolve debarment matters. *See* DFARS 209.406-1(a)(i) ("When the debarring official decides that debarment is not necessary, the official may require the contractor to enter into a written agreement which includes— (A) A requirement for the contractor to establish, if not already established, and to maintain the standards of conduct and internal control systems prescribed by FAR subpart 3.10; and (B) Other requirements the debarring official considers appropriate."); *see also* Compl. Exh. 8, Practitioner's Guide to Suspension and Debarment at 167 (explaining that an Administrative Agreement is appropriate in instances where a contractor is alleged to have repeatedly failed to perform its contracts).

Rather than meaningfully consider the Administrative Agreement terms proposed by Plaintiffs (and endorsed by the distinguished monitoring team), the Debarment Decisions reflect that DoD summarily rejected the proposal:

> The offer of an Administrative Agreement and its terms ***do not alleviate Precision Metals' requirement of present responsibility***. The lack of evidence that the Respondents' MIO provided provides no clear indication that Precision Metals has improved its contract performance and delivery, or that such improvement may be expected in the future. In fact, the opposite is clear; as described above, the Respondents' enhanced QMS procedures are not working.

Compl. Exh. 2, Precision Debarment Decision at 6 (emphasis added).

Again, DoD's conclusion reflects that it is overlooking the core purpose of an Administrative Agreement, which is designed to be used where an SDO has determined that a respondent is not yet presently responsible. Where an SDO has concluded that a contractor is presently responsible, an Administrative Agreement is unnecessary and indeed inappropriate. By offering an Agreement, Precision showed that, while it denied and disputed DoD's allegations, it nonetheless was receptive to oversight, monitoring, and implementation of any additional measures deemed appropriate by the Monitors and SDO.

In rejecting the proposed Agreement, DoD did not explain *why* the specific features of the proposed Administrative Agreement, which included numerous protections such as monitoring, are not sufficient to protect the Government's interests. Indeed, it remains unclear why DLA declined Plaintiffs' offer of an Agreement here, particularly where DLA has entered into at least a dozen Administrative Agreements during 2019-2020 according to publicly-available reports published by the Interagency Suspension and Debarment Committee. *See FY2019 Section 873 Report to Congress, ISDC* (Jan. 15, 2021), available at https://www.acquisition.gov/sites/default/files/page_file_uploads/ISDC%20FY19%20873%20Re

port.pdf; *FY2020 Section 873 Report to Congress, ISDC (Mar. 22, 2022), available at* https://www.acquisition.gov/sites/default/files/page_file_uploads/ISDC_FY_2020_Section_873_Report_(use_for_web_upload).pdf. As such, DoD engaged in arbitrary and capricious decision making. Nor did DoD identify any other terms that would address his concerns.

Moreover, this arbitrary decision-making is further evidenced by the fact that DLA has entered into at least ten Administrative Agreements in the past three years with contractors facing far more serious allegations, such as defective pricing (falsified pricing data), bid rigging and other antitrust violations, falsified testing, money laundering, Trade Agreements Act violations (supplying Chinese parts when Buy American or Trade Agreements Act countries only permitted), and contractors who delivered poor-quality parts and had on-time delivery issues. *See* Compl. Exh. 18, Analysis of DLA Administrative Agreements.

Furthermore, Mr. Lussier, who himself has endorsed entering into numerous Administrative Agreements with respondents on behalf of DoD during his 22-year career with DLA, explained in his Declarations that the SDO "should have given meaningful consideration to the Administrative Agreement proposed by Plaintiffs," as DLA has entered into Administrative Agreements with contractors in circumstances similar to those presented here." Compl. Exh. 7, Declaration of Normand V. Lussier at ¶¶ 26-27.

For these reasons, the Debarment Decisions violate the APA because they are arbitrary, capricious, an abuse of agency discretion, unsupported by substantial evidence, and not in accordance with law and regulation.

#### 6. DoD Did Not Establish a Cause for Debarment By a Preponderance of the Evidence

The Debarment Decisions do not establish a cause for debarment by a preponderance of the evidence. FAR 9.406-2(b) requires that a cause for debarment be established by a

preponderance of the evidence. Plaintiffs dispute that alleged delays under five "cherry-picked" orders of thousands performed resulting in no cost cancellations (as opposed to terminations for default or cause), even if true, provides a basis to debar. Indeed, Precision has performed successfully thousands of orders for DLA and enjoys a 99-percent quality score. Given DoD only has set a 75-percent on-time delivery score for its very top contractors, how can lateness on five orders of thousand warrant debarment? DoD's AR only has five orders in it, and Plaintiffs' MIO addressed each and demonstrated that each was impacted by DLA actions and inactions. DoD's decision to debar Plaintiffs based upon alleged delays under five orders is particularly unreasonable in light of the fact that Precision has successfully delivered over 290,000 parts to DoD and DoD prime contractors involving over $87 million. DoD's failure to consider Precision's overall successful performance record reflects arbitrary and capricious decision-making.

Additionally, Precision disputed DoD's allegation that it was responsible for the delays under the give orders and presented extensive evidence that DLA caused those delays. Similarly, Precision presented extensive evidence showing that, even beyond these five orders, DLA-related delays have impacted approximately 50% of Precision's current backlog orders and that events beyond its control, including supplier issues, supply chain shortages, COVID-19s impact on its workforce and vendors, and its founder's health played a role in other orders in its backlog. In its Debarment Decision, DoD plainly recognized that Precision disputed the allegations as to the five orders, but ultimately dismissed Precision's dispute finding no or inadequate evidence and found that Precision was responsible for all five of the orders being late and cancelled. *See* Compl. Exh. 2, Precision Debarment Decision at 4 ("When addressing each of the contracts that

form the basis of this action, the Respondents' MIO accepts no fault for why the orders turned out the way they did . . . ").

Notwithstanding DoD's decision, courts have held that the preponderance of the evidence showing cannot be met in a case like this where the cause for debarment is in genuine dispute and the debarring official failed to conduct a fact-finding hearing. These courts have explained that "[n]aturally, such a [preponderance of the evidence] showing ***would require the agency to rebut any evidence by the plaintiffs*** tending to show lack of willful failure to perform, or lack of improper conduct in the performance of government contracts." *Sterlingwear*, 11 Cl. Ct. at 890 n.9 (emphasis added). For this additional reason, the Debarment Decisions are arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

#### 7. DoD Appears to Have Used Debarment to Punish Plaintiffs Rather than Protect the Government

The governing regulations make clear that the Government should not debar an individual or company for the purposes of punishment. *See* FAR 9.402(b) ("The serious nature of debarment and suspension requires that these sanctions be imposed only in the public interest for the Government's protection and not for purposes of punishment."). Instead, the applicable regulations recognize that debarment is a serious action that the Government may take only to protect "the public interest." FAR 9.406-1. In every case, the standard for debarment is focused squarely on the contractor's *present responsibility* for participation in Federal programs. *See* FAR 9.406-1.

Here, the Debarment Decisions reflect that DoD used debarment to punish Plaintiffs for prior conduct rather than protect the Government in the future. Indeed, as set forth above and in the Complaint, the record shows that DoD appears to have pre-judged the outcome of this case *before* the agency had even read Plaintiffs' 85-page MIO and focused exclusively on the alleged

past delays ignoring the wealth of information and argument presented by Precision. This helps to explain why DoD improperly disregarded the substantial information and argument in Plaintiff's 85-page MIO, erroneously contended that Plaintiffs did not provide evidence to support its opposition to the NPD, discounted DLA's role in the delays, ignored evidence demonstrating that the enhanced QMS procedures are working, dismissed the observations of the monitoring team, dismissed the offer of an Administrative Agreement, short-circuited the debarment process and deprived Plaintiffs of their opportunity to provide additional information and argument at an in-person meeting, and unlawfully failed to conduct a fact-finding hearing.[9]

In short, the debarment system is about protecting the Government's business interests prospectively which is not achieved here given the only issue of concern was Precision's on-time delivery rate, and the AR shows Precision's significantly improved on-time delivery rate and performance record, including an 83-percent on-time rate for 2021, 100-percent on-time rate for 2022, successful on-time performance of 41 orders since the NPD was issued, and a substantial reduction in its backlog.

Indeed, it is well-established under case law that where a contractor participates in and performs government contracts satisfactorily ***since the events giving rise to a cause for concern***, the underlying events are not indicative of the contractor's present responsibility, and the debarring official should consider the contractor's performance of those contracts during the intervening years. *See, e.g., Silverman*, 817 F. Supp. at 847 (holding that the decision to debar was "arbitrary, capricious and an abuse of discretion" and citing to "[t]he fact that DLA

[9] Moreover, based upon his review of the AR, Mr. Lussier similarly stated that, in his opinion, DoD appears to have debarred Plaintiffs for the purposes of punishment. Compl. Exh. 7, Declaration of Normand V. Lussier at ¶ 28 ("When an agency declines a reasonable offer of an Administrative Agreement and debars a company like Precision t . . . the only reasonable conclusion that I can reach is that the agency has substituted punishment for protection.").

continued to enter into contracts with plaintiffs for a period of six years following the events underlying the misdemeanor conviction calls into question the agency's conclusion that plaintiffs were not presently responsible in May 1992"). DoD's Debarment Decisions gloss over Precision's recent successful performance record of many orders and its substantially improved on-time delivery rates and reduced backlog.

### 8. Debarment of Thomas and Tony Based on Imputation and Affiliation Was Improper

The Debarment Decisions make clear that Precision was debarred for alleged untimely performance of the five orders, and then DoD extended Precision's debarment to Thomas and Tony due to their roles for Precision under imputation and affiliation principles. The Debarment Decisions do not support the debarment of Thomas and Tony based upon affiliation and imputation. Indeed, the Debarment Decisions appear to have simply cut-and-pasted the boilerplate arguments from the NPD to justify the debarment of Thomas and Tony. In so doing, DoD glossed over and did not address Plaintiffs' arguments in the MIO that demonstrated that debarment based upon affiliation and imputation was improper.

First, as set forth above, DoD's decision to debar Precision was arbitrary, capricious, an abuse of agency discretion, unsupported by substantial evidence, and not in accordance with law and regulation. Thus, since the decision to debar Precision violated the APA and was thus unlawful and in violation of Plaintiffs' due process rights, the debarment of Thomas and Tony based on affiliation and imputation is also unlawful for the same reasons.

Second, it was improper for DoD to impute Precision's alleged untimely performance to Tony and Thomas. FAR 9.406–5(b) states that "***[t]he fraudulent, criminal, or other seriously improper conduct*** of a contractor ***may be imputed*** to any officer, director, shareholder, partner, employee, or other individual associated with the contractor who participated in, knew of, or had

reason to know of the contractor's conduct. (Emphasis added). As noted in the Complaint, there are no allegations of unethical conduct concerning Tony or Thomas, let alone "fraudulent," "criminal" or "other seriously improper conduct." *Id.* Rather, the allegations underlying the Debarment Decisions pertain solely to alleged late performance under five orders. *See* Compl. Exh. 2, Precision Debarment Decision at 5-6 ("the basis of this action is the Respondents' on-time delivery rate of DLA purchase orders"); *id.* at 4-5 (discussing the five "contracts that form the basis of this action"). Indeed, there is nothing in FAR 9.406-5(b) that suggests that contract performance delays could lead to imputation and such is wholly inconsistent with the express language of the regulations. Thus, the debarment of Thomas and Tony based on imputation was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

Third, DLA ignored the fact that Thomas is no longer an affiliate of Precision as that term is defined in FAR 9.403 because he is not in a position to control Precision and cannot be controlled by Precision. Indeed, Thomas has stepped away from the Company fully as a result of his service-related disability and has no intention of returning, which means that he does not qualify as an affiliate. As a result, it was improper for DoD to extend the debarment to Thomas based upon affiliation.

Fourth, there is no evidence in the record that Tony was in a position of power or control at time of events in question because at that time Thomas was in control and, thus, it was improper to impute Precision's alleged conduct to Tony under the affiliation theory. As noted in the Complaint, Tony did not take over as Precision's leader until late 2021, when he succeeded his father, and helped lead the Company past the events in question.

Fifth, in light of Thomas retiring from Precision and stepping away due to his health, Thomas is no longer a "contractor" and, thus, it was inappropriate for DoD to debar him, as the suspension and debarment system only exists to suspend and debar contractors found to be non-responsible. *See* FAR 9.406-1 (recognizing that debarment may be taken against a "Contractor"); *see also* FAR 9.403 (defining "contractor" as "any individual or other legal entity that—(1) Directly or indirectly (e.g., through an affiliate), submits offers for or is awarded, or reasonably may be expected to submit offers for or be awarded, a Government contract, including a contract for carriage under Government or commercial bills of lading, or a subcontract under a Government contract; or (2) Conducts business, or reasonably may be expected to conduct business, with the Government as an agent or representative of another contractor").

Sixth, as the Debarment Decisions state, "an affiliate can be suspended [or debarred] based solely on its affiliate status *so long as the agency* establishes that it is an affiliate, gives notice of the suspension, and *provides an opportunity to respond*." Compl. Exh. 2, Precision Debarment Decision at 10 (quoting *Agility Del & Gov't Servs. v. US. Dep't of Def.*, 739 F.3d 586, 590 (11th Cir. 2013)). Thus, since DoD short circuited the debarment process in this case and deprived Plaintiffs of their opportunity to respond during an ***in-person meeting*** under FAR 9.406-3(c), debarment of Thomas and Tony based solely upon their affiliate status with Precision is improper.

For these reasons, the Debarment of Thomas and Tony based upon affiliation and imputation was arbitrary and capricious, an abuse of agency discretion, and not in accordance with law and regulation.

### B. THIS COURT'S DUE PROCESS ANALYSIS SHOWS THAT THE DEBARMENT DECISIONS VIOLATED PLAINTIFFS' DUE PROCESS RIGHTS

The Second Circuit has recognized the Fifth Amendment due process protection for government contractors. *See Asbestec Const. Servs., Inc. v. U.S. E.P.A.*, 849 F.2d 765, 769 (2d Cir. 1988) (noting that damage to reputation and business prospects "is actionable only when made in the context of a denial of or discharge from a government contract"); *see also Rutigliano Paper Stock, Inc.*, 967 F. Supp. at 764 (recognizing that contractors have "a protected liberty interest" in eligibility to bid for federal contracts); *John Gil Const., Inc. v. Riverso*, 72 F. Supp. 2d 242, 253 (S.D.N.Y. 1999) ("Corporate entities such as government contractors have a protected liberty interest in their good name and reputation. If government actors damage that reputation by disseminating defamatory information without due process, the injured company may be entitled to relief.").

Further, the circuit courts have explained that, "in due process analysis, [this Court must] first determine whether constitutional safeguards apply at all, *i.e.*, whether a private party has a property or liberty interest that triggers Fifth Amendment due process protection." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594 (D.C. Cir. 1993) (citing *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538–41). Towards this end, the Second and D.C. Circuits have determined that contractors have a "***liberty interest*** in avoiding damage to its reputation and business caused by stigmatizing" suspensions or debarments. *Reeve*, 982 F.2d at 598 (emphasis added); *see also Rutigliano Paper Stock, Inc.*, 967 F. Supp. at 765 ("The private interest at stake here is an important one, since a suspension may result in the loss of all or nearly all of a contractor's business."); *Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1105 (D.C. Cir. 1985) (finding that the Government "deprive[d] Doe of a constitutionally protected liberty interest in reputation without due process"); *General Elec. Co. v. Jackson*, 610 F.3d 110, 122 (D.C. Cir. 2010) (noting that *Reeve* "held that the government's suspension of an airline from a

military airlift transportation program 'based on stigmatizing charges that the airline was unsafe did affect its liberty interest").

In addition, it is well-settled in the D.C. Circuit and the Ninth Circuit "that a debarment under the FAR 'is legal only if the contractor has been afforded full due process protections.'" *Friedler*, 271 F. Supp. 3d at 62 (quoting *BMY, a Div. of HARSCO Corp. v. United States*, 693 F. Supp. 1232, 1241 (D.D.C. 1988) ("A suspension or debarment, be it formal or constructive, is legal only if the contractor has been afforded full due process protections."); *Sameena* 147 F.3d at 1153 ("An agency's failure to follow its own regulations 'tends to cause unjust discrimination and deny adequate notice' and consequently may result in a violation of an individual's constitutional right to due process.") (quoting *NLRB v. Welcome–American Fertilizer Co.*, 443 F.2d 19, 20 (9th Cir.1971)); *Ali.*, 1998 WL 416473 at *2 ("By failing to abide by its own regulations, HHS violated Ali's constitutional right to due process."); *see also Rutigliano Paper Stock, Inc.*, 967 F. Supp. at 765 (finding challenge to suspension "unlikely to succeed" because the contractor "facing suspension under the FAR receive[d] all the process they are due").

Here, the Debarment Decisions stigmatized Plaintiffs and have denied Precision, Tony, and Thomas of their ability to do business with the Government based on a process that was unlawfully short-circuited and that stripped Plaintiffs of their due process rights. Indeed, as set forth above, DoD, among other things, failed to comply with its own regulations applicable to debarment by: (1) failing to provide Plaintiffs a FAR 9.406-3(c) an in-person meeting before reaching a final decision; (2) failing to conduct a FAR 9.406-3(d) fact-finding hearing in light of Plaintiffs' MIO creating a genuine dispute over material facts; (3) failing to meaningfully consider and provide any substantive response to the information and argument submitted in opposition to the proposed debarment; (4) failing to make any meaningful assessment of

Plaintiffs' present responsibility including considering the FAR mitigating factors and remedial measures; (5) failing to support its finding of a cause for debarment in its Debarment Decisions by a preponderance of the evidence; and (6) failing to meaningfully consider the proposed Administrative Agreement offered by Plaintiffs, which included monitoring, and how such an agreement could have been used to address DoD's concerns, including why such an agreement was appropriate in other cases before DLA but not in a case involving only allegations of untimely performance.

Thus, the Debarment Decisions' conclusion that there was a basis for Plaintiffs' debarments and that they are not presently responsible contractors denied Precision, Tony, and Thomas the substantive due process of law guaranteed to them by the FAR and the Fifth Amendment of the United States Constitution.

## III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT ISSUED

To demonstrate irreparable harm, the Second Circuit states that a party must show that the harm is "not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995)). As set forth below, there can be no dispute that Plaintiffs have met their burden by showing that they will suffer irreparable harm absent immediate injunctive relief.

### A. PLAINTIFFS WILL SUFFER CERTAIN, GREAT, ACTUAL, AND IMMINENT IRREPARABLE HARM BECAUSE THEIR BUSINESS WILL NOT SURVIVE IF THE DEBARMENT DECISIONS STAND AND THEY ARE DEPRIVED OF THE ABILITY TO COMPETE FOR DOD CONTRACTS AND SUBCONTRACTS

It is well-established that "the almost total loss of [ ] business and inability to bid on new contracts as a result of the suspension constitutes irreparable harm that cannot be remedied by monetary damages alone." *Rutigliano Paper Stock, Inc.*, 967 F. Supp. at 764 (citing *Semmes*

*Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)). Indeed, in the Second Circuit, the law "is firmly settled that the loss or destruction of a going business constitutes irreparable harm . . . ." *Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.*, 475 F. Supp. 1282, 1294 (E.D.N.Y. 1979); *see also John E. Hull Inc. v. Waterbury Petroleum Products Inc.*, 588 F.2d 24, 28-29 (2d Cir. 1978), *cert. denied*, 440 U.S. 960 (1979) ("A threat to the continued existence of a business can constitute irreparable injury.").

As detailed in Tony's Declaration, "Precision will be put out of business" if the Debarment Decisions are not enjoined:

> ***Debarment***, which serves to render Plaintiffs ineligible for DoD contracts and subcontracts, ***will lead to the demise of Precision***. The foreseen adverse effects include the public listing of Plaintiffs' names as "debarred" in the Government system known as the System for Award Management (www.sam.gov) for the world to see and the associated reputational harm, closing of its doors and bankruptcy, the layoffs of Precision's 42-valued employees, and the loss of the sole means to provide for our families who rely on and depend upon our incomes from Precision to survive. In other words, ***continued debarment will be the end of Precision***.

Compl. Exh. 5, Declaration of Anthony C. Figlozzi at ¶¶ 22, 26 (emphasis added); *see also id.* at ¶ 25 ("Precision cannot remain in business with only the revenues it receives from commercial customers.").

In fact, Precision has already lost out on numerous lucrative government contracting opportunities due to the Debarment Decisions. *See id.* at ¶ 25 ("Precision is losing out on government contracting and subcontracting opportunities on a daily basis due to its ineligibility."). Indeed, Precision recently had to turn down an order from Northrop valued at ***over $1,700,000.00*** million dollars. *See id.* ("Indeed, Precision has had to decline lucrative business opportunities because of its ineligibility, including multiple purchase orders from Northrop Grumman.").

Moreover, Precision's demise and the resulting loss of income will cause Tony, Thomas, and the entire Figlozzi family to sustain irreparable harm:

> I rely on the income I receive from Precision to support my wife and three sons (ages 12, 13, & 16). Additionally, my elderly mother, who works for Precision, and father rely on the financial support they receive from Precision to support themselves. ***Without income from Precision, our family will be left in dire straits***. Indeed, ***loss of income and employment would make it particularly difficult to support and care for my father***, who has serious health needs as a result of the heart attacks he suffered in 2019, the stroke he suffered in 2019, and an open-heart surgery that was performed in 2021.

*Id.* at ¶ 30 (emphasis added).

In addition, because debarment may serve to render him unemployable in the field of government contracting indefinitely, Tony, in particular, will suffer even greater imminent harm if an injunction is not issued:

> [I]f the Debarment decision stands, ***I will be ineligible to work in my chosen field of government contracting for as long as I remain debarred***. *See* Debarment Decisions at 12 (stating that Plaintiffs' "exclusion from government contracting" will "terminate on May 25, 2024"): *see also* FAR 9.405(a). Moreover, given the stigma attached to a debarment, ***it is unlikely that I will be able to gain meaningful employment working for a government contractor even after the debarment period ends***.

*Id.* at ¶ 31 (emphasis added).

Furthermore, "Precision's multimillion dollar investment in DoD business also will be lost" if the Debarment Decisions stand and an injunction is not issued. *Id.* at ¶ 27 (detailing "significant capital investments totaling almost $4,000,000" that will be lost if Precision is put out of business as a result of the Debarment Decisions).

In short, absent immediate injunctive relief, Precision "will be forced to close its doors imminently within several weeks to approximately a few months at most." *Id.* at ¶ 34. For each of these reasons, this factor weighs in favor of granting injunctive relief.

### B. Plaintiffs Will Suffer Reputational Harm From the Debarment Decisions

This Court has consistently held that "[l]oss of good will constitutes irreparable harm which cannot be compensated by money damages." *Ecolab Inc. v. Paolo,* 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991); *see also TVC Albany, Inc. v. Am. Energy Care, Inc.*, No. 1:12-CV-1471, 2012 WL 5830705, at *6 (N.D.N.Y. Nov. 16, 2012) ("The Second Circuit has recognized that damage to one's business reputation and loss of customer goodwill can constitute irreparable harm."); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (finding that improper contract termination for default that "left a black mark on Beacon's reputation ... [and] will result in many lost contract opportunities" was "irreparable absent an injunction.").

Here, in addition to the substantial harm outlined above, Tony's Declaration explained that the Debarment Decisions will ruin their reputations: "[t]he foreseen adverse effects include the public listing of Plaintiffs' names as 'debarred' in the Government system known as the System for Award Management (www.sam.gov) for the world to see and the associated reputational harm." Compl. Exh. 5, Declaration of Anthony C. Figlozzi at ¶ 26. For this additional reason, this factor weighs in favor of granting injunctive relief.

In sum, Plaintiffs have demonstrated that the harm from the Debarment Decisions is not theoretical. Rather, Plaintiffs have demonstrated that the harm is certain, great, actual, imminent. Accordingly, the Court should grant immediate injunctive relief to prevent the irreparable harm that would befall Plaintiffs if the Debarment Decisions stand.

## IV. The Balance of Harms and Equities Weighs Heavily in Plaintiffs' Favor

This factor requires the Court to "consider whether the balance of equities tips in favor of granting the injunction." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

The balance of equities may favor a preliminary injunction "as entering a preliminary injunction would merely preserve the status quo." *Perry St. Software, Inc. v. Jedi Techs., Inc.*, No. 20-CV-04539, 2020 WL 6064158, at *7 (S.D.N.Y. Oct. 14, 2020). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties . . . but to balance the equities as the litigation moves forward." *Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (internal citations omitted).

This is not a close case, as the balance of harms and equities weighs heavily in favor of granting Plaintiffs immediate injunctive relief. As set forth above and in Tony's sworn Declaration, "Precision is teetering on the brink of collapse" and Plaintiffs face "impending doom and certain irreparable harm" absent immediate injunctive relief. Compl. Exh. 5, Declaration of Anthony C. Figlozzi at ¶ 6. Defendants, on the other hand, will suffer no harm if an injunction is issued and Plaintiffs' eligibility to perform government contracts is reinstated. Indeed, Precision has a near perfect quality score of over 99-percent and DLA has not made any allegations about the quality of parts delivered by Precision.

Additionally, Precision is continuing to perform DLA orders presently without harm to DoD. As Tony explained in his Declaration, the enhanced QMS procedures "have continued to improve the Company's on-time delivery rate and has led to a significant reduction of over 40-percent in Precision's backlog of open orders measured from the backlog existing in December 2021 as compared to today." *Id.* at ¶ 15. In addition, Tony explained that "the enhanced QMS procedures have led to on-time delivery rates of 83-percent for 2021 and 100-percent for 2022 for all orders following DoD approval of the first article." *Id.* Thus, this data shows that debarment is not necessary to protect the Government interests because Precision's enhanced

QMS procedures are working as intended and substantially improving on-time delivery. Accordingly, the balance of harms and equities tips in Plaintiffs' favor.

### V. THE PUBLIC INTEREST FAVORS THE ISSUANCE OF AN INJUNCTION

The public interest similarly weighs in favor of Plaintiffs. Indeed, the Court must consider the "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). The D.C. Circuit has further explained that "[t]his is particularly true in the APA context." *League of Women Voters of the United States v. Newby.*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting further that "[t]here is generally no public interest in the perpetuation of unlawful agency action."); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting that "[t]he public interest is served when administrative agencies comply with their obligations under the APA."). If this Court allows DoD to debar contractors, such as Precision, without following its own written rules and regulations, the system will have lost all due process that is afforded to contractors, which is wholly inconsistent with the case law that led to such developments in the law. Indeed, DoD will be able to arbitrarily debar and destroy companies and the lives of individuals without the protections currently existing in the system. Thus, given that Plaintiffs have demonstrated that they will likely prevail on their claims that DoD's Debarment Decisions violated the APA and Plaintiffs' constitutional due process rights, the Court should find this "substantial public interest" to be implicated here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction and award

Plaintiffs all relief the Court deems appropriate including Plaintiffs' reasonable attorneys' fees and costs under EAJA.

Dated: June 27, 2022

Respectfully submitted,

/s/ Richard P. Donoghue
Richard P. Donoghue
Scott D. Greenspan
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 858-1000
Fax: (212) 858-1500
richard.donoghue@pillsburylaw.com
scott.greenspan@pillsburylaw.com

Todd J. Canni (*pro hac vice forthcoming*)
J. Matthew Carter (*pro hac vice forthcoming*)
Kevin R, Massoudi (*pro hac vice forthcoming*)
PILLSBURY WINTHROP
SHAW PITTMAN LLP
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017-5524
Tel: (213) 488-7100
Fax: (213) 629-1033
todd.canni@pillsburylaw.com
matt.carter@pillsburylaw.com
kevin.massoudi@pillsburylaw.com

*Counsel for Plaintiffs Precision Metals Corp., Anthony C. Figlozzi, and Thomas J. Figlozzi*